**UNITED STATES of America, Plaintiff-Appellee,**

**v.**

**Cassius Marsellus CLAY, Jr., Defendant-Appellant.**

**No. 28252.**

United States Court of Appeals, Fifth Circuit.

July 6, 1970.

Rehearing Denied and Rehearing En Banc Denied Aug. 19, 1970.

Charles Morgan, Jr., Reber F. Boult, Jr., Atlanta, Ga., Chauncey Eskridge, Chicago, Ill., M. W. Plummer, Houston, Tex., for defendant-appellant; Melvin L. Wulf, Eleanor Holmes Norton, New York City, of counsel.

Anthony J. P. Farris, U. S. Atty., James R. Gough, Asst. U. S. Atty., Houston, Tex., for plaintiff-appellee; Joseph J. Connolly, Michael T. Epstein, Attys., Dept. of Justice, of counsel.

Jack Greenberg, James M. Nabrit, III, Jonathan Shapiro, Elizabeth B. DuBois, New York City, amicus curiae.

Before WISDOM, AINSWORTH and CLARK, Circuit Judges.

AINSWORTH, Circuit Judge.

This Selective Service case involves the conviction by a jury on June 20, 1967 of Cassius Marsellus Clay, Jr., also known as Muhammad Ali, former professional heavyweight boxing champion of the world, for wilfully refusing to be inducted into the Armed Forces of the United States, in violation of 50 U.S.C. App. § 462, and is before us for the second time.[1] We affirmed the conviction on May 6, 1968, and rehearing

en banc was denied June 6, 1968. See Clay v. United States, 5 Cir., 1968, 397 F.2d 901.

The defendant then petitioned the Supreme Court for certiorari, and while the petition was pending before that Court, the Government revealed that there had been five telephone conversations participated in by defendant which were overheard by the Federal Bureau of Investigation by electronic wiretapping. Accordingly, the Supreme Court granted certiorari, *sub nom.* Giordano v. United States, 394 U.S. 310, 89 S.Ct. 1163, 22 L.Ed.2d 297 (1969), and remanded this case to the District Court for further proceedings in conformity with Alderman v. United States, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969), to determine whether the conviction was affected by the wiretaps.

Pursuant to the Supreme Court's grant of certiorari, a lengthy hearing was then held before District Judge Joe Ingraham on June 2, 4, 5, and 6, 1969, in Houston, Texas, at which time the Court considered the FBI logs of the five wiretapped telephone conversations delivered to it in advance of the hearing by the Government. The Court then ordered that the logs of wiretapped conversations 1, 2, 3, and 4 be received in evidence and their contents fully disclosed to the defendant. As to these four logs of wiretapped telephone conversations, the Court held that the defendant had standing to assert the illegality of the surveillance and that the illegality was not challenged by the Government. The fifth log of a wiretapped conversation in which defendant participated was considered in camera by the District Judge, with related exhibits, and held to be a lawful surveillance by the FBI pursuant to the Attorney General's authorization of a wiretap for the purpose of gathering foreign intelligence.

The District Court concluded that the first four logs did not bear on the issues involved in defendant's conviction; that

---

1. Defendant's request that this case, now on its second time before the Court, be heard en banc was denied on February 10, 1970. 422 F.2d 1330 (5 Cir.).

the defendant failed to show any relevancy of these logs to the conviction; and that the conviction must stand. The fifth wiretapped conversation which related to the gathering of foreign intelligence was held to be lawful surveillance, reasonable and necessary to the protection of the national interest.

As we have stated, logs 1, 2, 3, and 4 were made available to defendant to afford him an opportunity to show the relevance of any of these wiretapped conversations to his Selective Service law conviction. (The logs are all of the evidence which the FBI possesses of the wiretapped conversations, the tapes on which the conversations were originally recorded having been erased when the logs were typed.) The five telephone conversations were not tapped in an electronic surveillance of defendant Clay but were made in connection with surveillance of others, the defendant not having been the subject of the surveillance.

Log 1 pertained to a telephone conversation on April 22, 1965, when the telephone of Elijah Muhammad was tapped in Phoenix, Arizona. A person named Herbert called the defendant, Clay, asking him about his physical condition, prospective fights, and personal details relative to the family.[2]

Log 2 referred to another wiretap of a telephone conversation of the telephone of Elijah Muhammad on March 24, 1964. Elijah called defendant Clay, telling him that he wanted to see him about making a minister out of him when "he quit thinking of fighting all the time" and that Clay would make a better minister than a fighter.[3]

Log 3 was another log of a wiretap of the Phoenix, Arizona, telephone of Elijah Muhammad of a telephone conversation on October 22, 1964, when a man believed to be John Ali talked to a person believed to be the defendant, Clay, giving him a message from Elijah about holding up "those TV people," who were apparently about to interview Clay.[4]

2. Log 1 is reproduced in full as follows:
"Herbert called, via operator, to 305–635–8893 in Miami and asked to speak to Cassius Clay. Herbert told Clay he was here in Arizona and asked how Clay was. Clay said he was fine and was down to 213 pounds. Herbert told him not to overdo it. Herbert asked him if he was going to Boston soon and he said yes, about a week and a half. Herbert said he would be down there to see him fight with his brother. Clay told him to call two days before. Clay mentioned that one boy backed out. He asked Herbert how long he was going to be out here and Herbert said he might leave tomorrow. Herbert asked how everything else was and Clay said fine. Herbert asked how his brothers were and Clay mentioned that James got put out of the temple for being out all night with women. Herbert said Clay knew what to do with a case like that, to get him a ticket and send him back where he came from. Herbert asked about * * * (probably his wife) and ·Clay said she had gone to Jackson with a lady friend. Herbert said he would probably call him tomorrow, to take it easy and if there was anything he could do to let him know. Clay mentioned something about having Herbert check his car when he, Herbert, got to Chicago. /Recorded/."

3. Log 2 is reproduced in full as follows:
"Elijah took call from C. Clay. Elijah asked the time there and then said it was only 1 hr. faster than here. Elijah said he wanted to see Clay as he was going to make a minister out of him when he quite (sic) thinking of fighting all the time. Elijah said he would make a better minister than a fighter anyhow. Elijah then said he would contact him when he had time to talk to him. Elijah also told him to keep quiet."

4. Log 3 is reproduced in full as follows:
"Man believed to be John Ali is heard dialing out on Albert's phone for a long distance call via direct dial. He then talks to person believed to be Muhammad Ali (Clay) and says he has just talked with the Messenger and the Messenger would like for him to hold up those TV people a while since they are going to be here Saturday and he will see what they want so that he (Elijah) will know what (Clay) is going to be asked to say. John mentions that he will probably be coming there when he leaves Phoenix and should be there for Saturday and Sunday. He then gives the Muslim closing."

Log 4 was taken on September 4, 1964, in Atlanta, in connection with surveillance of the telephone of Dr. Martin Luther King, Jr. MLK (ostensibly Dr. King) exchanged greetings with defendant Clay, wished him well on his recent marriage, and in turn was invited to attend defendant's next championship fight. Clay also told MLK to take care of himself, that he is known world wide, and admonished him that he "should watch out for them whities," etc.[5]

■ The Trial Judge held that "the logs are so totally innocuous that they could not have had any bearing on the defendant's conviction under any circumstances." The District Judge's reasons in this regard, ably expressed, with which we agree, are reproduced in pertinent part in the margin.[6]

5. Log 4 is reproduced in full as follows:
"Chauncey to MLK, said he is in Miami with Cassius, MLK spoke to Cassius, they exchanged greetings, MLK wished him well on his recent marriage, C invited MLK to be his guest at his next championship fight, MLK said he would like to attend. C said that he is keeping up with MLK that MLK is his brother, and with him 100% but can't take any chances, and that MLK should take care of himself, that MLK is known world wide and should watch out for them whities, said that people in Nigeria, Egypt and Ghani asked about MLK."

6. The Trial Judge said:
"Turning to the significance of the logs, the only manner in which the foregoing conversations were argued relevant to the defendant's conviction centered around the rejection of the defendant's conscientious objector claim. This was a plausible argument, for if the recommendation by the Department of Justice to deny the claim was based upon illegally obtained evidence, the 'basis in fact' which this court found for his classification would have been defective. Without such a 'basis of fact', the defendant could effectively challenge the jurisdiction of the draft board which classified him and ordered him to report for induction.
"The specific relevancy sought between the defendant's classification and the overheard conversations involves the statement in the Department of Justice's recommendation that 'registrant's objections to participation in war insofar as they are based upon the teachings of the Nation of Islam "rest on grounds which are primarily political and racial. These constitute objections to only certain types of war in certain circumstances, rather than a general scruple against participation in war in any form." ' Clay v. United States, 397 F.2d 901 (5 C.A. 1968). The defendant attempted to show first, that because Log 2 reflects Elijah's wish that Clay become a minister, and because Log 4 reflects Clay's reference to 'them whities', the logs would have a bearing on the Department's conclusion that the defendant's beliefs were political and racial, rather than religious. He secondly attempted to demonstrate how this information was transmitted upward through F.B.I. channels, through the Department of Justice and into the recommendation, and back to the draft appeals board.
"As to the second argument, that the information was used by the Department of Justice in making its recommendation, there was positive testimony that the logs were not used at all in the preparation of the report. Only the most strained construction of the cross-examination testimony would support a contrary finding. But the court need not reach this question, for it believes, and so holds, that the logs are so totally innocuous they could not have had any bearing on the defendant's conviction under any circumstances. This is because, first, as regards Log 2, the Department of Justice's duty was to submit a recommendation concerning the defendant's status as a conscientious objector, not a minister. It is obvious that the Department could have, had it believed it was warranted, recommended that the defendant be granted a conscientious objector deferment despite the fact that he was not a minister of his religion. Moreover, even if this issue had been before the Department, it is clear that the evidence that he was not a minister up to at least March 19, 1966, is overwhelming. See discussion in Clay v. United States, *supra* at 915–918. Thus examining this log in a light most likely to demonstrate prejudice to the defendant, there is more than enough evidence to dispel possible taint. The conclusion that the defendant should not have been entitled to a ministerial exemption springs clearly from an 'independent origin'. Nardone v. United States, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939).
"Defendant's attempt to link Log 4 to his conviction must similarly fail. To construe a passing reference to 'them whities' as being the Department's basis, or even

■ There was likewise no error committed by the District Court in rejecting the broad and sweeping demands for discovery by defendant's counsel of FBI files, documents, wiretapping information and tapes and transcriptions, relating to persons and conversations not participated in by defendant. All of the logs of recorded conversations of defendant were produced for his inspection except the fifth wiretap which pertained to foreign information gathering and which we will discuss later. The defendant had no right to see records or logs of conversations to which he was not a party, nor to rummage in Government files. Alderman v. United States, 394 U.S. 165, 185, 89 S.Ct. 961, 973, 22 L.Ed. 2d 176 (1969); Taglianetti v. United States, 394 U.S. 316, 317, 89 S.Ct. 1099, 1100, 22 L.Ed.2d 302 (1969). It is clear from uncontradicted testimony that none of the information obtained in the five wiretapped telephone conversations was used in the FBI investigation of defendant's conscientious objector claim, or in the preparation of the adverse Department of Justice recommendation made in connection with defendant's original request for conscientious objector classification.[7] In our view the Trial Court exercised "informed discretion, good sense, and fairness," *Alderman, supra,* 394 U.S. at 185, 89 S.Ct. at 973, in denying defendant's discovery demands and we perceive no sound reason for interfering with his decision.[8]

partial reason, for holding the defendant's beliefs to be political and racial is completely untenable. The conversation was not a theological discussion. The common slang reference was not within a context which could have had any bearing on the *defendant's* beliefs. A Negro not a member of the Nation of Islam would be as likely to say the same thing. In addition, if it had been in such a context, and it could be construed to be even viciously derogatory, again there was ample evidence from an independent origin before the *Department to conclude* that the Muslim religion holds the white race in contempt. See Clay v. United States, *supra* 397 F.2d at 919 n. 16.

"As regards Logs 1 and 3, they are so totally innocuous even defendant's counsel could not point to any specific language which could bear on the defendant's conviction. The thrust of defendant's argument concerning these logs, as well as Logs 2 and 4 was that there must have been other matters discussed by the parties which were relayed to the Department of Justice. The court does not credit this argument. The testimony was clear that the original tapes were erased immediately after the logs were typed, and that the logs received in evidence were the only ones prepared. The individuals who monitored the conversations in Phoenix testified that they communicated no other information to anyone."

7. Defendant was mailed a copy of the adverse recommendation on November 29, 1966. *See* 397 F.2d at 906.

8. The District Judge, in his memorandum opinion, said in this regard:

In Alderman v. United States; supra, the Court said that '(n)one of this means that any petitioner will have an unlimited license to rummage in the files of the Department of Justice. Armed with the specific records of overheard conversations and with the right to cross examine the appropriate officials in regard to the connection between those records and the case made against him, a petitioner may need or be entitled to nothing else. Whether this is the case or not must be left to the informed discretion, good sense, and fairness of the trial judge.' Id. at 185, 89 S.Ct. at 961. And in Taglianetti v. United States, 394 U.S. 316, 89 S.Ct. 1099, 22 L.Ed.2d 302 (1969), the Court said that '(n)othing in Alderman v. United States, Ivanov v. United States, or Butenko v. United States, ante, p. 165, requires an adversary proceeding and full disclosure for every issue raised by an electronic surveillance. * * * Here the defendant was entitled to see a transcript of his own conversations and nothing else. He had no right to rummage in government files.' Id. at 317, 89 S.Ct. 1099. Despite the foregoing, the defendant's counsel insistently requested what would be, in essence, a full-scale inquiry into F.B.I. practices. The court does not believe that anything was shown which would warrant such an inquiry. Defendant had ample opportunity to demonstrate first, that the logs contained prejudicial material, and second, that the material was communicated to and was used by the Department of Justice in making its recommendation. Had he established the first,

The fifth wiretap was not disclosed to defendant because the District Court found that the surveillance was lawful, having been authorized by the Attorney General, for the purpose of obtaining foreign intelligence information. The Supreme Court has not yet decided whether electronic surveillance for the purpose of gathering foreign intelligence information is constitutionally permissible, Giordano v. United States, *supra*, 394 U.S. at 314, 89 S.Ct. at 1165, 1166, 22 L.Ed.2d 297 (1969), though Mr. Justice White has expressed the view that such surveillance does not violate the Fourth Amendment. *See* Katz v. United States, 389 U.S. 347, 364, 88 S.Ct. 507, 517, 19 L.Ed.2d 576 (1967).

Moreover, in *Giordano, supra*, 394 U.S. at 314, 89 S.Ct. at 1165, Mr. Justice Stewart in a concurring opinion stated the following in regard to the mandate of *Alderman, supra,* for further hearing and the procedure to be followed in a criminal case where wiretapping information relative to a defendant had been obtained.

"We have nowhere indicated that this determination cannot appropriately be made in *ex parte, in camera* proceedings. 'Nothing in Alderman v. United States, Ivanov v. United States, or Butenko v. United States, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176, requires an adversary proceeding and full disclosure for resolution of every issue raised by an electronic surveillance.' Taglianetti v. United States, 394 U.S. 316, 89 S.Ct. 1099, 22 L.Ed.2d 302."

An in camera examination of the fifth log and a description of the premises which were the subject of the surveillance, together with the Attorney General's express authorization to the FBI to make the surveillance, was accordingly made by the Trial Judge. It has also been made by the three judges of this panel. From this examination we agree that the log of the fifth wiretapped telephone conversation (1) was authorized by the Attorney General in writing to the FBI; (2) that it was not made pursuant to a surveillance of defendant but rather of others, and the premises were identified; (3) that it was made in connection with obtaining foreign intelligence information; (4) that the Executive Branch of the Government has properly and reasonably requested that the log not be published or disclosed to the defendant or the public because "it would prejudice the national interest to disclose the particular facts concerning this surveillance other than to the court *in camera*" (see affidavit of Attorney General Mitchell); and (5) its contents do not in any manner bear upon the issues involved in defendant's draft law violation case, and in no way has this wiretap prejudiced defendant, helped build a case against him, or assisted in bringing about his conviction.

Defendant and amicus contend that the Supreme Court's decision in *Alderman, supra,* requires an adversary hearing and mandates that all wiretapped information of defendant's conversations be furnished to him, including the fifth log pertaining to foreign intelligence gathering; that the District Court erred in failing to disclose the fifth log to him and in not holding a hearing thereon to determine if the wiretap tainted defendant's conviction; that full disclosure is required by the Constitution and the Bill of Rights, and that section 605 of the Federal Communications Act of 1934,

perhaps more extensive discovery would have been in order. But the defendant should not be permitted such broad discovery to attempt to prove transmittal of the information if he cannot first show that the information could have been, even in part, relevant to his conviction.

"It might be added that Taglianetti v. United States, supra, intimates that the district court could, in some circumstances, make the determination that wiretap evidence is innocuous in an in camera inspection. This is, the court believes, such a case. Nevertheless, an adequate opportunity was given the defendant to prove relevance in an adversary proceeding. The proceeding was as extensive as Alderman requires. He failed to show the requisite relevancy, and the conviction must stand."

47 U.S.C. § 605, bars any use of wiretap in a criminal prosecution.

■ Under the circumstances here, publication of the fifth log to defendant is unwarranted and would be contrary to the national interest, having been obtained in foreign intelligence surveillance. The Court's in camera examination of the fifth log establishes to our satisfaction that the contents of the wiretap were not germane to any issue in this criminal prosecution and conviction. There has been no use against defendant of the information gained by the Government by the fifth wiretap and the information there obtained would not have been of assistance to the prosecutor in constructing a case against defendant. There is no indication that the information was or could be used in any way against defendant.

■ *Determination of this case* requires that we balance the rights of the defendant and the national interest. The Attorney General, who acts here for the President and Commander-in-Chief, has submitted his affidavit that the fifth wiretap was maintained "for the purpose of gathering foreign intelligence information" and the Attorney General opposed disclosure at the hearing because "it would prejudice the national interest to disclose particular facts concerning this surveillance other than to the court." The fifth log was submitted by the Government for an in camera examination by the Court, which has been made both here and in the District Court. The rights of defendant and the national interest have thus been properly safeguarded. Further judicial inquiry would be improper and should not occur. It would be "intolerable that courts, without the relevant information, should review and perhaps nullify actions of the Executive taken on information properly held secret." Chicago & Southern Air Lines v. Waterman S.S. Corp., 333 U.S. 103, 111, 68 S.Ct. 431, 436, 92 L.Ed. 568 (1948). We, therefore, discern no constitutional prohibition against the fifth wiretap.

■ Section 605 of Title 47, U.S.C., is a general prohibition against publication or use of communications obtained by wiretapping, but we do not read the section as forbidding the President, or his representative, from ordering wiretap surveillance to obtain foreign intelligence in the national interest. When Congress enacted Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2511(3) thereof, it specifically denied any section 605 limitation, as follows:

"(3) Nothing contained in this chapter or in section 605 of the Communications Act of 1934 (48 Stat. 1143; 47 U.S.C. 605) shall limit the constitutional power of the President to take such measure as he deems necessary to protect the Nation against actual or potential attack or other hostile acts of a foreign power, to obtain foreign intelligence information deemed essential to the security of the United States, or to protect national security information against foreign intelligence activities. Nor shall anything contained in this chapter be deemed to limit the constitutional power of the President to take such measures as he deems necessary to protect the United States against the overthrow of the Government by force or other unlawful means, or against any other clear and present danger to the structure or existence of the Government. The contents of any wire or oral communication intercepted by authority of the President in the exercise of the foregoing powers may be received in evidence in any trial hearing, or other proceeding only where such interception was reasonable and shall not be otherwise used or disclosed except as is necessary to implement that power."

This is a clear statement by Congress itself relative to the scope of the section 605 provisions which are not to limit the President's constitutional prerogative to obtain foreign intelligence information.

We reiterate that no use of the fifth log was made in this case against defendant. It played no part in his conviction and our in camera scrutiny thereof thoroughly convinces us that defendant was not prejudiced thereby. As the

Supreme Court said in Taglianetti v. United States, 394 U.S. 316, 317, 318, 89 S.Ct. 1099, 1101, 22 L.Ed.2d 302 (1969), "Under the circumstances presented here, we cannot hold that 'the task is too complex, and the margin for error too great, to rely wholly on the *in camera* judgment of the trial court.' Alderman v. United States, *supra,* 394 U.S., at 182, 89 S.Ct., at 971, 22 L.Ed.2d 176." No one would seriously doubt in this time of serious international insecurity and peril that there is an imperative necessity for obtaining foreign intelligence information, and we do not believe such gathering is forbidden by the Constitution or by statutory provision, including 47 U.S.C. § 605.

■ We are urged to reconsider the issues decided by us in our original decision in this case, 397 F.2d 901, but we decline to do so.[9] We declined en banc reconsideration of our original decision and further refused en banc considera-

tion of this second hearing in this case. Our prior decision is the law of the case on the issues decided there, unless they are affected by the wiretapped telephone conversations.[10] In our view, the defendant's conviction was not so affected and accordingly the judgment of conviction should be

Affirmed.[11]

## ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

PER CURIAM:

The Petition for Rehearing is denied and the Court having been polled at the request of one of the members of the Court and a majority of the Circuit Judges who are in regular active service not having voted in favor of it, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is also denied.

9. We have, however, examined the recent holding of the Supreme Court in Welsh v. United States, 398 U.S. 333, 90 S.Ct. 1792, 26 L.Ed.2d 308 (1970), to determine if that decision affects the present case. In our view, it does not. The Supreme Court granted Welsh a conscientious objector status because of "deeply and sincerely" held ethical or moral beliefs which imposed on Welsh "a duty of conscience to refrain from participating in any war at any time." The Court found that Welsh's beliefs functioned "as a religion in his life," thereby entitling him to a "religious" conscientious objector exemption under Section 6(j) of the Universal Military Training and Service Act (50 U.S.C.App. § 456(j)), 398 U.S. at 335, 90 S.Ct. at 1795. Section 6(j) grants an exemption from service in the Armed Forces to a registrant "who, by reason of religious training and belief, is conscientiously opposed to participation in *war in any form.*" (Emphasis supplied.) As we pointed out in our original opinion in this case, the Department of Justice recommendation (made in connection with the conscientious objector investigation), to the Kentucky Board of Appeals, stated that Clay's beliefs insofar as they are based upon the teachings of the Nation of Islam "rest on grounds which are primarily political and racial. These constitute objections *to only certain types of war in certain circumstances,*

*rather than a general scruple against participation in war in any form.*" (Emphasis supplied.) *See* 397 F.2d at 918–919. The Kentucky Board of Appeals thereafter continued the I-A classification of Clay. That there was also a "basis in fact" for the numerous local board, state appeal boards (Kentucky and Texas) and Presidential Appeal Board I-A classifications of Clay, thereby including an adverse determination of the question of Clay's basic sincerity, is amply shown and detailed in our original opinion and in the record to which reference is made. *See* 397 F.2d at 918–921.

10. Defendant has cited the Presbyterian Church in United States v. Mary E. B. Hull Mem. Pres. Ch., 393 U.S. 440, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969), in support of its contention that the Department of Justice's analysis that the teachings of the Nation of Islam are primarily political and racial and that this interpretation violates the establishment clause of the First Amendment. We reject this argument for reasons which we have discussed in full in our original opinion in this case relative to Muslim tenets. *See* 397 F.2d at 918–921.

11. We have carefully considered all of the additional contentions of defendant, but find them to be without merit, and accordingly they are rejected.