STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v. ROBERT E. BISACCIA, ANTHONY GIACALONE, NICHOLAS PETITO, THOMAS YANNUZZI, MICHAEL J. EQUIEIO a/k/a MIKE JOSEPH EGIDO, AND JOSEPH M. PISANO, DEFENDANTS-RESPONDENTS.

Argued May 24, 1971—Decided July 21, 1971.

*Mr. David S. Baime,* Assistant Prosecutor, argued the cause for appellant (*Mr. John De Cicco,* on the brief; *Mr. Joseph P. Lordi,* Essex County Prosecutor, attorney).

*Mr. Anthony T. Colasanti* argued the cause for respondents (*Mr. Angelo R. Bianchi,* attorney).

The opinion of the Court was delivered by

WEINTRAUB, C. J. The trial court ordered the suppression of evidence seized under a search warrant. The Appellate Division affirmed. We granted the State's petition for certification. 57 *N. J.* 599 (1971).

The affidavit submitted on the application for the warrant described the premises as:

> 371 10th Street, Belleville, New Jersey, which is a one story frame building with a store; in front a large sign over the entrance saying Coca Cola Toys — Candy Coca Cola.

The affidavit mentioned also "the front porch" upon which a look-out was stationed. The search warrant authorized a search of "the premises located at 371 10th Street, a one story frame building Belleville, New Jersey." It did not contain the further factual detail we have quoted from the affidavit.

The officer who executed the warrant was the affiant in the affidavit and he had personally made the surveillance of the premises detailed in the affidavit. The judge who issued the warrant of course intended the very building described in the affidavit, and the structure searched was the very premises the officer described in his affidavit. The motion to suppress rested upon the fact that the correct number of the building was 375, rather than 371. But the building was unmistakably described in the affidavit. It was a one-story frame building; it had a store; there was the sign reading "Coca Cola Toys—Candy Coca Cola"; and it had a front porch. No other structure in the vicinity matched that description. There would have been no problem had the warrant contained that further description. See *State v. Daniels*, 46 *N. J.* 428 (1966).

The error as to street number occurred this way: The one-story building described in the affidavit did not bear a street number. It stood between two two-story structures, one of which was numbered 373. The officer concluded that the premises in question, if numbered, would be numbered 371. In fact the numbers ran the other way, so that the number attributable to the premises in question was 375. At 371, there was an empty lot with a small unused garage in the rear, a distance variously estimated from 50 to 100 feet from the sidewalk. The building in question, like those

near it, had a setback of five feet. Neither the vacant lot nor the garage bore an identifying number; the number 371 is to be found, we gather, only on the tax bill for the lot. The nearest one-story building on either side of the street was four or five houses away from the property here involved.

In deciding whether the rule of suppression innovated as to the States by *Mapp v. Ohio*, 367 *U. S.* 643, 81 *S. Ct.* 1684, 6 *L. Ed.* 2d 1081 (1961), should be applied, it is well to reflect upon the competing values involved.

Truth and justice are inseparable. A deliberately false judgment debases the judicial process, and no less so because the false judgment is an acquittal. On a motion to suppress we deal with evidence of guilt, and the purpose of the litigant is to conceal that evidence to the end that he will escape conviction notwithstanding his guilt. Hypothetically there could be some case in which the evidence sought to be suppressed would falsely suggest guilt, but a judge would be short in realism if he did not understand that the evidence he is asked to suppress is evidence of guilt and that the judgment of not guilty which will ensue will likely be false. To justify so serious an insult to the judicial process, some compensating gain should be incontestable.

One cannot reasonably deny the need for some remedy for a breach of the Fourth Amendment guaranty against an unreasonable search and seizure. The question is whether suppression of the truth with the consequent acquittal of the guilty is a fair and an effective measure to that end. The ostensible reason for the rule is to assure compliance with the Fourth Amendment by barring the use of the fruits of a violation. That suppression is effective in curtailing infractions of the Amendment is quite doubtful. See Oaks, "Studying the Exclusionary Rule in Search and Seizure," 37 *U. Chi. L. Rev.* 665 (1970). But if it were, the justice of the suppression doctrine would remain questionable as it was when *Mapp* was handed down, and even more so because

of a decade of experience under that decision. The reasons are evident.

The first right of the individual is to be protected from attack. That is why we have government, as the preamble to the Federal Constitution plainly says. In the words of *Chicago v. Sturges,* 222 *U. S.* 313, 322, 32 *S. Ct.* 92, 93, 56 *L. Ed.* 215, 220 (1911):

> Primarily, governments exist for the maintenance of social order. Hence it is that the obligation of the government to protect life, liberty, and property against the conduct of the indifferent, the careless, and the evil-minded, may be regarded as lying at the very foundation of the social compact.

The Bill of Rights was not intended to deny that primary mission. This is not to belittle the inestimable rights thus consecrated, but rather to say that those rights may not be read to defeat the very reason for government itself.

We must be mindful that the contest is not between the State and the individual. The contest is wholly between competing rights of the individual — the right to be protected from criminal attack and the several rights in the Amendments. When the truth is suppressed and the criminal is set free, the pain of suppression is felt, not by the inanimate State or by some penitent policeman, but by the offender's next victims for whose protection we hold office. In that direct way, *Mapp* denies the innocent the protection due them.

But *Mapp* impairs the primary right of the individual to protection from crime in still other ways. The release of the guilty must blunt and breed contempt for the deterrent thrust of the criminal law. Moreover the case-by-case process of lawmaking in the application of *Mapp* has left State officers quite at sea as to what is expected of them. The time-distance between the Supreme Court and the firing line is just too great and the case-by-case process too lumbering and too cumbersome, to permit that Court to exercise effective and responsible management of the criminal business of

the States. As a result, the State courts (and the federal bench as well) are drained of energy sorely needed for the trial of criminal and civil cases, as motions to suppress are piled upon motions, appeals upon appeals, and post-conviction proceedings upon post-conviction proceedings.

It is puzzling that the suppression rule was not anchored to the reason for its creation. The evil sought to be ended was insolence in office. Before being overtaken by *Mapp,* we contemplated the possibility of suppressing the product of a search if the facts showed such official arrogance. *Eleuteri v. Richman,* 26 *N. J.* 506 (1958). But *Mapp* as applied calls for suppression whenever a search is found to violate the Amendment, even by a bare majority of a court, and notwithstanding that the policeman and the magistrate acted without a trace of insolence.

In the light of the menace *Mapp* had in mind, such indiscriminate suppression seems to many to constitute overkill. Especially is this so when, ten years after *Mapp,* five opinions are filed in *Coolidge v. New Hampshire,* 402 *U. S.* ——, 91 S. Ct. 2022, 29 *L. Ed. 2d* 564 (June 21, 1971), a case involving so simple a situation as the seizure and search of a motor vehicle believed to be the instrumentality and evidence of a murder. There the majority opinion acknowledges "attempts over a hundred years to develop a coherent body of Fourth Amendment law" (91 S. Ct. at p. 2042) and "disagreement about the basic rules to be applied, as our cases concerning automobile searches, electronic surveillance, street searches and administrative searches make clear" (91 S. Ct. at p. 2042). The opinion agreed that "Of course, it would be nonsense to pretend that our decision today reduces Fourth Amendment law to complete order and harmony. The decisions of the Court over the years point in differing directions and differ in emphasis" (91 S. Ct. at p. 2047). Since the majority opinion reiterated that "The exclusionary rules were fashioned 'to prevent, not to repair,' and their target is official misconduct" and that "They are 'to compel respect for the constitutional guaranty in the

only effective available way — by removing the incentive to disregard it'" (91 S. Ct. at p. 2049), it is difficult to understand why so much havoc should ensue when there can be no doubt of the good faith of the officer or of the magistrate, and when the worst that can be said is that an appellate court, after argument and reflection, is divided upon whether there was indeed any infraction at all of the Fourth Amendment.

In the case now before us, there is no definitive opinion of the United States Supreme Court holding the search to be invalid. Our task is to anticipate whether a majority of that Court would extend *Mapp* to the circumstances before us. We would hope that it would not. Here the policeman and the magistrate in good faith sought to abide by the Constitution. The place searched was undeniably the place as to which probable cause had been made out, and the place searched was in fact the place the warrant was meant to describe. Nor did the error in the street number in the warrant taint the justice of the search. At best the error would permit the projection of some possible evil in a supposititious case in which the officer executing the warrant might have gone or might have been thought by the occupant to have gone to the wrong target. Nothing of the kind occurred.

In *Steele v. United States*, 267 *U. S.* 498, 503, 45 S. Ct. 414, 416, 69 *L. Ed.* 757, 760 (1925), the Court said:

\* \* \* It is enough if the description is such that the officer with a search warrant can, with reasonable effort ascertain and identify the place intended.

The Court did not limit the "reasonable effort" to an examination of the face of the warrant alone. It would make sense to permit the officer to look at the affidavit in the official court file to resolve an ambiguity which appears when the warrant is sought to be applied to the physical scene. Here the officer was the affiant on whose affidavit the warrant had issued. He knew the judge who issued the warrant in-

tended the building he had amply described in his affidavit. We see no threat to Fourth Amendment values in these circumstances. To suppress the truth would be a waste of the public interest.

We found such knowledge on the part of the officer to be relevant in *State v. Daniels, supra,* 46 *N. J.* at 438. Other courts have also held that the executing officer may take into account his prior knowledge as to the place intended in the warrant. See *United States v. Pisano,* 191 *F. Supp.* 861 (S. D. N. Y. 1961); *United States v. Goodman,* 312 *F. Supp.* 556 (N. D. Ind. 1970); *State v. Doust,* 285 *Minn.* 336, 173 *N. W. 2d* 337 (Sup. Ct. 1969); *Morales v. State,* 44 *Wis. 2d* 96, 170 *N. W. 2d* 684 (Sup. Ct. 1969).

The judgment of the Appellate Division is reversed and the order of suppression of the trial court is set aside, and the matter remanded for trial.

Jacobs, J., concurs in result.

*For reversal and remandment*—Chief Justice WEINTRAUB and Justices FRANCIS, PROCTOR, HALL, SCHETTINO and MOUNTAIN—6.

*For affirmance*—None.