116 N.J. Super. 49 (1971)
280 A.2d 853
STATE OF NEW JERSEY, PLAINTIFF,
v.
WILLIAM S. CARLUCCIO, HENRY J. LAFFMAN AND JAMES DE CHRISTOFORO, DEFENDANTS.
Superior Court of New Jersey, Hudson County Court, Law Division (Criminal).
July 29, 1971.
*51 Mr. Edwin H. Stern, First Assistant Prosecutor, and Mr. Edward T. O'Connor, Jr., Assistant Prosecutor, for plaintiff (Mr. Geoffrey Gaulkin, Hudson County Prosecutor, attorney).
Mr. Dennis D. McAlevy for defendant Carluccio.
Mr. John P. Russell for defendant Laffman.
Mr. Elmer J. Herrmann, Jr., for defendant De Christoforo.
BOTTER, J.S.C. (temporarily assigned).
On this motion to suppress evidence I advised counsel at oral argument that I would grant defendants' request to cross-examine the detective upon whose affidavit search warrants issued. The prosecutor asserts that such a hearing cannot be held, but that probable cause must be judged by the affidavit alone. *52 Since this issue has not been decided in this State[1] or by the United States Supreme Court,[2] I have adjourned the proceedings to give the prosecutor an opportunity to seek leave to appeal from my order.
Two search warrants were issued by a Superior Court judge based upon the affidavit of a detective of the New Jersey State Police Organized Crime Task Force Bureau. One warrant authorized the search of a specific one-story house in West New York, New Jersey, and persons on the premises; the other authorized the search of an automobile and an unnamed but described person previously seen operating the auto in the vicinity of the premises. The raid, seeking evidence and paraphernalia pertaining to illegal lottery and bookmaking operations, was apparently successful and defendants were indicted for the suspected crimes.
The detective's affidavit recites in part that:
I, the deponent * * * did receive information from a reliable informant, whose information in the past has proven to be reliable, and which did result in gambling arrests. Said informer did advise the deponent that over telephone number 867-3138 a male who answers said telephone by saying "Willie" is conducting a gambling operation over said telephone, namely bookmaking and/or lottery, and informer having advised the deponent that he had placed illegal gambling wagers to "Willie" over said telephone.
The affidavit also recites the results of a surveillance of the house in which the telephone was located. The surveillance was on October 3, 6, 7 and 8, 1969. This recital describes comings and goings of unnamed persons between 10:45 A.M. at the earliest and 7:50 P.M. at the latest on the days mentioned. For example, on October 3 a male left the side door of a nearby tavern, the Laffman Bar, at 10:45 A.M. and entered the house carrying "a yellow pad and newspaper." Shortly thereafter a second male arrived carrying *53 "a brown paper bag," and then a third male came out of the side door of the Laffman Bar and entered the house. This third male then left shortly thereafter and from that time on made six round trips between the tavern and the house, staying in each place for varying intervals. On one trip he placed "slips of white paper into a slot on the door." On two other trips he delivered a small bag and a white envelope to the house. On the afternoon of October 3 a fourth man arrived in a certain vehicle and entered the house carrying a brown paper bag and then went to the tavern. He drove off later and again returned to the house. Other persons, not described, entered the house at 7:30 P.M.
The first two men who entered the house on October 3 entered again on October 6 at 10:45 A.M., carrying newspapers. At 11:00 A.M. the third male again left the nearby tavern and entered the house. On these occasions each man opened the door with his own key. Nothing else was observed on October 6. On October 7 similar but fewer comings and goings were observed as on October 3, the most suspicious single act being the delivery of a white envelope by the "third man" from the tavern to the house at 2:15 P.M. On the last day, October 8, similar comings and goings were observed, without any slips, bags or envelopes recorded, except that the first two men arrived carrying a newspaper. On the basis of these observations and the information supplied by the "reliable informant" the detective concluded that illegal gambling operations were being conducted at the house and over the telephone there, namely, "bookmaking and/or lottery."
On the motion to suppress, defendants urged that the affidavit on its face was insufficient to establish probable cause.[3] At oral argument this was rejected. The hearsay *54 report of the "reliable informer," combined with the surveillance, made out a case for the warrant, although neither the hearsay nor the surveillance was sufficient by itself. United States v. Harris, 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971); Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1962); State v. Mercurio, 113 N.J. Super. 113 (App. Div. 1970), aff'd o.b. 57 N.J. 367 (1971); State v. Mack, 114 N.J. Super. 513 (App. Div. 1971). See also State v. Kasabucki, 52 N.J. 110 (1968). Cf. Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964).
Thereupon defendants requested permission to examine the detective (who was present in court at the time of the motion) to test his credibility solely as to the report of the secret informer. That the informer's identity is entitled to complete protection in the course of the inquiry was conceded by defendants. State v. Burnett, 42 N.J. 377 (1964); McCray v. Illinois, 386 U.S. 300, 87 S.Ct. 1056, 18 L.Ed.2d 62 (1966); N.J.S.A. 2A:84A-28.

I
The Fourth Amendment and the New Jersey Constitution (1947) Art. I, par. 7, in almost identical language guarantee the freedom of all people from unreasonable searches and seizures. "No warrants shall issue, but upon probable cause supported by oath or affirmation * * *," is a covenant exacted to protect the people against arbitrary transgression by government officers. Boyd v. United States, 116 U.S. 616, 625, 6 S.Ct. 524, 29 L.Ed. 746 (1885). Abusive writs of assistance, infringing upon privacy, "inaugurated *55 the resistance of the colonies to the oppressions of the mother country." Ibid. This constitutional safeguard is of greater importance today.[4] Today the threat of search by invisible intrusion, by electronic surveillance  bugging and wiretapping and intercepting  hangs over every citizen like a cloud.[5] Although the rules in search and seizure cases draw criticism day by day, even in opinions by our *56 most esteemed judges,[6] in my view a diminution of the Fourth Amendment will cost our citizens the price of liberty that no increase in the number of convictions is worth. The answer to unlawful searches is not to sanction them because some police officers are recalcitrant. The answer is to end unlawful searches. At least we must strive for this goal. We have not abandoned the criminal laws because they have failed to deter all crime.
Our system of justice is not disgraced by the acquittal of a defendant because illegally seized evidence cannot be used against him. I believe our system is ennobled by this rule. Judges uplift our system to the degree in which constitutional rights are enforced in a full and sympathetic spirit. Nor is the public uniformly dismayed by the discharge of an accused when the law requires that result. Trial courts see this often enough when juries acquit despite a mass of evidence lawfully seized. Juries acquitted defendants in 43% of 49 illegal gambling cases studied in the mid-1950's. Kalven & Zeisel, The American Jury, 67, 74 (1968). This was before the adoption of the rule that no comment or inference of guilt can be based upon defendant's failure to testify in his own defense, Griffin v. California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), and before the exclusionary rule of Mapp v. Ohio, infra, was applied to the states. Juries show a high rate of leniency as compared with the willingness of judges to convict, particularly in gambling cases, and it is in these cases that a high proportion of motions to suppress are now made. Oaks, infra, 37 U. Chi. L. Rev. at 681.
Juries are not dismayed by the right of a man to be silent, to be presumed innocent, by the need for proof beyond a reasonable doubt.
*57 Studies of 3576 criminal cases show that, where judges disagreed with the verdict of juries, judges thought convictions were warranted in roughly 50% of the cases in which juries acquitted defendants. Kalven & Zeisel, op. cit. at 58. Of course, the constitutional rights of an accused make it more difficult to convict him. However, juries acquit for many reasons unrelated to evidence legally seized. To some extent, in gambling cases for example, they acquit because the State has legalized betting at tracks and, now, with the New Jersey Lottery, all over the State. There is some evidence that a jury will acquit "in protest against a police or prosecution practice that it considers improper." Kalven & Zeisel, op. cit. at 319. Thus, the public may not be agonized by the suppression of evidence seized illegally when the guilt of an accused has not yet been established, and might not be even if the evidence could be used. The assumption that we are always discharging people who would otherwise be convicted is not valid. The foregoing statistics belie the charge that crime in America, bad as it is, is caused by judges who are too soft. This accusation should not stampede us into surrendering our constitutional liberties. If more convictions are wanted, or less crime, many steps can be taken without abandoning the Bill of Rights.
The right to be secure from unreasonable searches and seizure must prevail even at the cost of allowing some crimes to go unpunished. Mr. Justice Jackson, dissenting in Brinegar v. United States, 338 U.S. 160, 180-181, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949), has expressed the significance of this great right in modern terms. It goes beyond condemning the "dirty business" of wiretapping. Olmstead v. United States, 277 U.S. 438, 470, 48 S.Ct. 564, 72 L.Ed. 944 (1928) (Mr. Justice Holmes, dissenting). It goes beyond the need to "preserve the judicial process from contamination." Id. at 484, 48 S.Ct. at 575, Mr. Justice Brandeis dissenting). Mr. Justice Jackson said in Brinegar, supra:
*58 Among deprivations of rights, none is so effective in cowing a population, crushing the spirit of the individual and putting terror in every heart. Uncontrolled search and seizure is one of the first and most effective weapons in the arsenal of every arbitrary government. And one need only briefly to have dwelt and worked among a people possessed of many admirable qualities but deprived of these rights to know that the human personality deteriorates and dignity and self-reliance disappear where homes, persons and possessions are subject at any hour to unheralded search and seizure by the police.
But the right to be secure against searches and seizures is one of the most difficult to protect. Since the officers are themselves the chief invaders, there is no enforcement outside of court.
The right of privacy (Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967))  to be free of unreasonable searches and seizures  is a part indispensable to the whole of freedom. Without privacy not one man but a whole nation can become cowed and frigid. Without privacy the soul of man withers. This right is the atmosphere of our freedom; it is like the air we breathe, enveloping, invisible, yet sustaining, so long as it is there. Without it other rights will perish, especially free speech and assembly.[7] What is the right of free speech and assembly if Big Brother is listening? See the innocent conversation recorded by the F.B.I. involving Cassius Clay, his attorney and Dr. Martin Luther King, n. 5, supra.
Evidence seized in violation of the Fourth Amendment is contaminated and cannot be used in a criminal proceeding. Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914); Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); Spinelli v. United States, supra. This is one incident of the violation of a person's constitutional rights. Other means are needed to vindicate such rights. One has been established by way of a federal action for damages against the wrongdoer. Bivens case, supra, n. 6. See also, 42 U.S.C. § 1983 (1964), creating a federal cause of action against state officials. Bivens, 91 S.Ct. at 2020. (Mr. Justice Black, dissenting).

*59 II

Shall a defendant have the right to a hearing to prove that statements of material facts in an affidavit used to procure a warrant are fictitious?
That police officers have knowingly and intentionally disregarded the need for a search warrant is disclosed by the many cases before us.[8] In fact, the argument is now in vogue that we should slowly abandon the exclusionary rule, whatever the cost to our constitutional rights, because police officers will fabricate testimony to establish probable cause for an arrest and an incidental search without a warrant.[9] Examples are the so-called "dropsie" cases where evidence is dropped, and "plain view" cases where weapons normally concealed are discovered to be carelessly left exposed.
To deny the defendant the right to prove the falsity of a material avowal, intentionally contrived to obtain a search warrant, is to say that facts alone insufficient for a warrant become sufficient if augmented by facts invented by a police officer. The affidavit is used to invoke the jurisdiction and obtain the process of the court. If perjurious in material respects, it corrupts the process, and the process should be voided as fraudulently obtained. We are not speaking here of erroneous, immaterial statements or honest mistakes. See Rugendorf v. United States, supra, n. 2, 376 U.S. at 532-533, 84 S.Ct. 825; State v. Bisaccia, 58 N.J. 586 (1971). A rule that permits a showing of intentional falsity will attack the "evil sought to be ended," namely, "insolence in office," *60 given in Bisaccia, supra, as the reason for the exclusionary rule.
There is a conflict in the cases as to whether a hearing should be permitted to test the truth of an affidavit underlying the warrant. In Rugendorf v. United States, supra, n. 2, 376 U.S. at 531-532, 84 S.Ct. at 827, the United States Supreme Court said that it had never "passed directly on the extent to which a court may permit such an examination" (emphasis added), but the court assumed that such an attack could be made for the purpose of its decision. Our highest court has noted that the warrant may issue ex parte, "with, as yet, unclear limits upon what may be disputed upon a motion to suppress." State v. Burnett, supra, n. 1, 42 N.J. at 388. At times testimony has been taken at the hearing to suppress, often for the purpose of upholding the warrant and supplementing the record made before the issuing judge. State v. Clemente, 108 N.J. Super. 189 (App. Div. 1969), is an example. There the State produced the detective who procured the warrant, and the defense called the municipal court judge who issued it. This procedure to expand what was before the issuing judge has now been condemned as contrary to R. 3:5-6. State v. Stolzman, 115 N.J. Super. 231 (App. Div. 1971). However, some kind of hearing is implied by State v. Bisaccia, supra, holding that a warrant issued for 371 10th Street was validly executed at 375 10th Street, the building in fact intended to be searched, but mistakenly numbered in the affidavit and warrant. In State v. Smith, supra, n. 1, the question was expressly left open, but the case was decided on the assumption that the warrant was invalid because the affiant knew the affidavit to be false in a material respect.
Mutuality of remedy for the State and a defendant is not the issue. The State has the opportunity to rely on hearsay and make out its case ex parte. The burden of proof in attacking a search warrant is on the defendant. State v. Mark, 46 N.J. 262, 273 (1966). Although the State is limited to its affidavit and the transcript or summary *61 of the ex parte proceeding filed by the issuing judge, Stolzman, supra, there should still be room to show in exceptional cases typographical or other honest errors to sustain a warrant, such as in Bisaccia, supra, n. 6. But the defendant should not be precluded from attacking the affidavit. A defendant must be allowed to prove fraud or falsity by other evidence. There will be no other way in most cases where a secret informer is involved. See King v. United States, 282 F.2d 398 (4 Cir.1960), where testimony established that the person accompanying federal officers apparently used someone else's name in signing the affidavit. To deny a hearing would preclude the traditional right of confrontation of witnesses, the right to ascertain the truth in an adversary proceeding. Testing truth by cross-examination is a vital and distinctive feature of the Anglo-American system of law. 5 Wigmore on Evidence (3rd ed. 1940) § 1367 at 28 et seq.; see Alderman v. United States, supra, 394 U.S. at 183-184, 89 S.Ct. 961.
Most federal courts and some states have allowed a defendant to challenge the averments in the affidavit,[10] while the majority of states are opposed.[11] In California, section 1539 of the Penal Code requires a magistrate to take testimony if the "grounds on which the warrant was issued be *62 controverted." See Aday v. Superior Court of Alameda County, 55 Cal.2d 789, 13 Cal. Rptr. 415, 362 P.2d 47 (Sup. Ct. 1961). In New York the Court of Appeals, in People v. Alfinito, supra, n. 10, held that a hearing was proper to determine whether the affidavit was perjurious, with the burden of proof on defendant and doubt to be decided in favor of the warrant. The court said:
Modern thought which produced the decision in Mapp v. Ohio * * * would make incongruous any holding that a search warrant is beyond attack even on proof that the allegations on which it was based were perjured. Our duty is to fashion a rule which will prevent such a violation of the citizen's rights and at the same time avoid creating a situation where overstrict rules would invalidate numerous warrants simply because witnesses can later be found to swear to the opposite of what the officer swore when he procured the warrant. [16 N.Y.2d at 185-186, 264 N.Y.S.2d at 246, 211 N.E.2d at 646]
In People v. Bak, supra. n. 11, the Supreme Court of Illinois conceded that persuasive arguments could be made for the other side, but held that a suppression hearing must be limited to an examination of the face of the complaint and warrant. The reasons given were that (a) intentional misrepresentations could be punished; (b) the protection of informers may be impaired by such a hearing, and (c) it would produce the undesirable result of one judicial officer evaluating the affiant's credibility and another reassessing it at the suppression hearing.[12] The first reason I would answer by reference to my views expressed in Part I above. The availability of punishment, a doubtful remedy (see Oaks, supra, 37 U. Chi. L. Rev. at 673), should not preclude another means to vindicate a constitutional right. The answer to the second reason has been given in State v. Burrachio, 39 N.J. 272, 275 (1963), where a similar argument was rejected. Obviously, the court must limit the inquiry in order to protect the informer. A similar problem *63 may be presented in the trial on the merits. The answer to the third reason advanced is that existing procedures permit a judge to review a warrant issued by another judicial officer. The only question is whether to substitute a hearing, when circumstances justify it, so that an adversary procedure can be substituted for a pure review.
All articles on the subject agree that in appropriate circumstances a hearing should be afforded so that defendant may show the warrant was secured unlawfully. Note, "Testing the Factual Basis for a Search Warrant," 67 Colum. L. Rev. 1529 (1967); Kipperman, "Inaccurate Search Warrant Affidavits as a Ground for Suppressing Evidence," 84 Harv. L. Rev. 825 (1971); Mascolo, "Impeaching the Credibility of Affidavits for Search Warrants; Piercing the Presumption of Validity," 44 Conn. B.J. 9 (1970); Note, 51 Cornell L.Q. 822 (1966); Note, 34 Fordham L. Rev. 740 (1966); Note, 15 Buffalo L. Rev. 712 (1966); Note, 32 Brooklyn L. Rev. 423 (1966). Differences in opinion are registered as to the showing which must be made to succeed. All agree, however, that deliberate falsity justifies suppression.

III
In the case at hand defendants seek to examine the detective solely as to his averments concerning the "reliable informer." Questions will be circumscribed to protect the informer's identity. It will be difficult to prove the intentional falsity of statements attributed to an informer. Except for cross-examination, however, defendants have no other practical way to proceed.
The prosecutor argues that even if a testimonial hearing is to be allowed in some cases, no showing has been made here to raise any doubt concerning the informer's report. Obviously, defendants had not furnished an affidavit contradicting the hearsay report of an undisclosed person. But a hearsay report must be inherently credible. State v. Christy, 112 N.J. Super. 48, 68 (Cty. Ct. 1970). Here *64 some glimmer of doubt, sufficient to justify closer inquiry, is presented by the affidavit itself.
The hearsay report recites that the informer said he placed illegal gambling wagers with a man named Willie over the telephone and that Willie is conducting a gambling operation, "namely, bookmaking and/or lottery." Certainly if the informer placed bets with Willie he would know whether it was bookmaking (wagers on sporting contests, such as horse races), or lottery (numbers) or both. It may be that the "and/or" is simply the detective's language, his own legalistic translation of what the informer said. But some other conclusion may be drawn after the detective testifies. Also, it is noted that nowhere in the affidavit or search warrant is a last name given for Willie. In fact, except for the person in whose name the telephone was listed, and the person in whose name the car was registered, neither of whom was indicted, no full name of any person is given in the affidavit or search warrant. Defendants suggest that it is doubtful that a person could place a bet by phone with someone with whom he was not well acquainted. Wagers have to be delivered and winnings paid off. Yet no identification was given by the informer of anyone in the operation except a man named Willie, not otherwise described.
On the surface the affidavit makes out probable cause. However, the only fair test of the credibility of the report concerning the informer is to afford defendants the opportunity of cross-examination. Testimony need not be believed if it is inherently improbable, especially if no one is available to contradict it. See In re Perrone, 5 N.J. 514, 522 (1950); Ferdinand v. Agricultural Ins. Co. of Watertown, N.Y., 22 N.J. 482 (1956). Probable cause means "suspicion of guilt that is well grounded; a reasonable basis for a belief that a crime has been or is being committed." State v. Kasabucki, supra, at 116. This is the ultimate test in a suppression hearing. My holding is that there can and should be such a hearing, with the right afforded defendants to offer testimony in this case.
NOTES
[1] See State v. Burnett, 42 N.J. 377, 388 (1964); State v. Smith, 113 N.J. Super. 120, 128 (App. Div. 1971).
[2] Rugendorf v. United States, 376 U.S. 528, 531-532, 84 S.Ct. 825, 11 L.Ed.2d 887 (1963).
[3] Defendants Carluccio and Laffman also urged that the search warrant was invalid as to them, and that searching them as they entered the house was invalid, since they had not been particularly described in the search warrants. State v. Masco, 103 N.J. Super. 277 (App. Div. 1968). The prosecutor concedes the invalidity of the search warrant as authority to search unnamed persons not otherwise described in the warrant, but contends that such search, nevertheless, was incidental to a lawful arrest. Testimony of the detective has not been taken on this issue and it remains open.
[4] See Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 2032, 29 L.Ed.2d 564 (1971), where the court said, in an opinion by Mr. Justice Stewart:

In times of unrest, whether caused by crime or racial conflict or fear of internal subversion, this basic law and the values that it presents may appear unrealistic or "extravagant" to some. But the values were those of the authors of our fundamental constitutional concepts. In times not altogether unlike our own they won  by legal and constitutional means in England, and by revolution on this continent  a right of personal security against arbitrary intrusions by official power. If times have changed, reducing every man's scope to do as he pleases in an urban and industrial world, the changes have made the values served by the Fourth Amendment more, not less, important.
[5] See: Westin, "Science, Privacy, and Freedom: Issues and Proposals for the 1970's," 66 Colum. L. Rev. 1003 (1966); Alderman v. United States, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969), holding a defendant's conversation, or conversations on his premises, cannot be unlawfully intercepted, but that he has no standing to object to the unlawful electronic eavesdropping directed at another person, even though this leads to evidence against him; United States v. United States District Court, 444 F.2d 651 (6 Cir., April 8, 1971), holding that government wiretaps without a warrant are illegal in domestic security cases; United States v. Clay, 430 F.2d 165 (5 Cir.1970), rev'd on other grounds, 403 U.S. 698, 91 S.Ct. 2068, 29 L.Ed.2d 810 (1971). In the Clay case the government admitted to four illegal wiretaps, recording conversations of Cassius Clay (also known as Muhammed Ali). It was revealed that Rev. Dr. Martin Luther King's telephone had been tapped (430 F.2d at 168). Later testimony of an F.B.I. agent disclosed that the F.B.I. had kept a telephone surveillance on Dr. King for several years before his death. New York Times, June 5, 1969, at 27. In one conversation Clay's attorney, Chauncey Eskridge, called from Clay's residence in Miami to Dr. King at his home in Atlanta. Clay spoke on an extension phone. This conversation was in 1964. Recorded notations showed an exchange of friendly words, and ended with Clay warning Dr. King to take care of himself and "watch out for them whities." Ibid. at 168.
[6] See opinion of Burger, C.J., dissenting, Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) (Harlan, J., concurring, Black, J., concurring and dissenting, and Blackman, J., joining Black, J., in part); Coolidge v. New Hampshire, supra, n. 4; Weintraub, C.J., State v. Bisaccia, 58 N.J. 586 (1971).
[7] Marcus v. Search Warrants, etc., 367 U.S. 717, 724-729, 81 S.Ct. 1708, 6 L.Ed.2d 1127 (1961).
[8] See: Oaks, "Studying the Exclusionary Rule in Search and Seizure, 37 U. Chi. L. Rev. 665 (1970). Mapp. v. Ohio, supra, is an example. There three police officers entered Miss Mapp's residence looking for someone wanted for questioning about a bombing, and looking for lottery paraphernalia. They pretended to have a search warrant, went through her personal papers and made a widespread search of the premises. They found obscene photographs and convicted Miss Mapp for unlawful possession.
[9] See Burger, C.J., in Bivens, supra, n. 6, 91 S.Ct. at 2014-2015; Oakes, supra, n. 8, 37 U. Chi. L. Rev. at 698, 708.
[10] United States v. Pearce, 275 F.2d 318 (7 Cir.1960); United States v. Roth, 391 F.2d 507 (7 Cir.1967); King v. United States, supra; United States v. Halsey, 257 F. Supp. 1002 (S.D.N.Y. 1962), aff'd on other grounds, mem. No. 31369 (2 Cir.1967); People v. Alfinito, 16 N.Y.2d 181, 264 N.Y.S.2d 243, 211 N.E.2d 644 (Ct. App. 1965); O'Bean v. State, 184 So.2d 635 (Miss Sup. Ct. 1966). See also, United States v. Gillette, 383 F.2d 843, 848-849 (2 Cir.1967); United States v. Freeman, 358 F.2d 459, 463, n. 4 (2 Cir.1966); United States v. Poppitt, 227 F. Supp. 73, 77 (D. Del. 1964).
[11] People v. Bak, 45 Ill.2d 140, 258 N.E.2d 341 (Sup. Ct. 1970), cert. den. 400 U.S. 882, 91 S.Ct. 117, 27 L.Ed.2d 121 (1970); Tucker v. State, 244 Md. 488, 224 A.2d 111 (Ct. App. 1966), cert. den. 386 U.S. 1024, 87 S.Ct. 1381, 18 L.Ed.2d 463 (1967); Baker v. State, 448 P.2d 282 (Okla. Ct. Crim. App. 1968); Owens v. State, 217 Tenn. 544, 399 S.W.2d 507 (Tenn. Sup. Ct. 1966); Griffey v. State, 168 Tex. Cr. R. 338, 327 S.W.2d 585 (Ct. Crim. App. 1959).
[12] See Halsey, supra, n. 10, assessing other considerations of a practical nature.