[Crim. No. 32245. Second Dist., Div. One. Sept. 5, 1978.]

THE PEOPLE, Plaintiff and Respondent, v.
CHRISTOPHER MICHAEL SWEARINGEN,
Defendant and Appellant.

## Counsel

James Bledsoe, Jr., for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Norman H. Sokolow and Roy C. Preminger, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**THOMPSON, J.**—After his motion to suppress evidence pursuant to Penal Code section 1538.5 was denied, defendant, Christopher Michael Swearingen, pled guilty to possession of hashish for sale. In this appeal, he challenges the trial court order denying his motion to suppress. Swearingen contends that at the hearing on the motion, the trial court erroneously denied his claim that because the police and prosecution had failed to comply with the obligation to preserve material evidence imposed upon them by *People* v. *Hitch* (1974) 12 Cal.3d 641 [117 Cal.Rptr. 9, 527 P.2d 361], testimony establishing probable cause to search was inadmissible.

We conclude: (1) physical evidence lost or destroyed by the police after Swearingen's arrest bears directly upon a conflict between testimony of the police and Swearingen on the crucial point going to probable cause to search; and (2) the prosecution failed to sustain its burden of demonstrating that the police agency had established, enforced, and attempted in good faith to adhere to systematic procedures designed to preserve the

evidence. Accordingly, we conclude that the trial court erred in considering the prosecution testimony describing the relevant detail of the missing physical evidence and reverse the judgment.

On the afternoon of March 23, 1977, Los Angeles Police Officers Boissier and Metz saw Swearingen driving in a van without a front license plate. They stopped the van in order to issue its driver a citation for lack of the plate and to determine if the van was stolen. Swearingen walked from the van toward the officers. He produced a registration form and turned his back toward the officers as he searched in his wallet before producing a driver's license.

Boissier walked to the passenger side of the van. There he saw lying on the floor of the van what he testified to be a transparent vial in which he could see marijuana. Based on his purported observation, Boissier entered the van where he discovered a substantial quantity of marijuana in a felt bag under the driver's seat, more of the substance in a pea coat, and still more marijuana in a closed box in the rear of the vehicle. The discovery of the marijuana led to Swearingen's arrest, his confession to possession of the marijuana after a *Miranda* warning, and Swearingen's consent to search his apartment. That subsequent search disclosed the hashish which Swearingen was convicted of possessing together with other contraband.

Swearingen's testimony refuted that of Boissier. Swearingen testified that the vial in the van was opaque rather than transparent so that its content could not be seen unless the vial were held up to the light.

Swearingen's motion to suppress was combined with a "*Hitch*" motion. Boissier acknowledged that when Swearingen was arrested and booked, Boissier realized the evidentiary significance of the vial. Boissier intended to preserve it. The content of the vial was removed for chemical analysis and the vial was placed in a box with other evidence in the case which was not contraband. The box was then placed in the police station's property room, apparently a caged area. When the time came for Swearingen's preliminary hearing, the vial and the felt bag in which other marijuana was found in the van could not be located although the other evidence that had been placed in the box was still in it. The vial was never found. The prosecution produced no evidence concerning procedures employed to preserve evidence in the property room or what in fact had been done to preserve the vial.

In *People* v. *Hitch, supra,* 12 Cal.3d 641, our Supreme Court adopted a rule of preservation of evidence previously enunciated by the Court of Appeals for the District of Columbia in *United States* v. *Bryant* (1971) 439 F.2d 642. It held that where discoverable evidence "cannot be disclosed because of its intentional but nonmalicious destruction by the investigative officials, sanctions shall . . . be imposed for such nonpreservation and nondisclosure unless the prosecution can show that the governmental agencies involved have established, enforced and attempted in good faith to adhere to rigorous and systematic procedures designed to preserve [the missing evidence]. The prosecution shall bear the burden of demonstrating that such duty to preserve the [evidence] has been fulfilled. . . . If the prosecution fails to meet its burden then the court shall apply sanctions for nondisclosure." (*People* v. *Hitch, supra,* 12 Cal.3d at pp. 652-653.) The court concludes that the sanction shall not be dismissal of the criminal charge but rather exclusion of evidence.

■ Here the prosecution failed in its burden of showing that the police agency had established, enforced, and attempted in good faith to adhere to rigorous and systematic procedures designed to preserve physical evidence. *Hitch* thus required the trial court to impose the sanction of barring testimony relating to the nature of the vial which the presence of the vial in court could have rebutted. The trial court erred in not granting Swearingen's "*Hitch*" motion to that end.

The error is prejudicial. Boissier's purported observation of marijuana within the vial is the crucial element in the validity of the search of the van and Swearingen's consequent confession and consent to search his apartment. If Boissier in fact could see the marijuana within the vial from a point outside the van, the subsequent search of the vehicle and all police activity which followed was valid. If, however, the vial was opaque so that its content could not be viewed from outside the van, the search of the vehicle was invalid and the subsequent confession and consent to search the apartment were the tainted product of an illegal arrest.

■ The Attorney General argues that *Hitch* is applicable only when there has been an intentional destruction of evidence by the police and not negligent loss of evidence. The argument fails for two reasons. On the law, the *Hitch* rule exists to guarantee a defendant a fair trial through the preservation of evidence and not to punish police conduct. A fair trial is no less denied by negligent loss of evidence than it is by nonmalicious destruction. On the facts, the prosecution, which had the burden of

establishing what happened to the evidence, did not show that it had not been destroyed rather than merely lost.

The Attorney General also argues that a plethora of evidence other than the content of the vial supports Swearingen's guilt. The argument ignores the proposition that this appeal is from a conviction based upon a plea of guilty after a 1538.5 motion was denied, and the fact that all the other evidence is the tainted product of an illegal arrest if the motion should have been granted. (See *People* v. *Hill* (1974) 12 Cal.3d 731, 767-768 [117 Cal.Rptr. 393, 528 P.2d 1], disapproved on other grounds in *People* v. *DeVaughn* (1977) 18 Cal.3d 889, 896, fn. 5 [135 Cal.Rptr. 786, 558 P.2d 872].)

The judgment (order granting probation) is reversed. The matter is remanded to the trial court for further proceedings on defendant's motion to suppress and *Hitch* motion, and for retrial if the motion to suppress is denied.

Lillie, Acting P. J., concurred.

**HANSON, J.**—I respectfully dissent. I would affirm the judgment of conviction.

The case of *People* v. *Hitch* (1974) 12 Cal.3d 641 [117 Cal.Rptr. 9, 527 P.2d 361], is distinguishable and does not apply. It is limited to material evidence going to the guilt or innocence, as charged, during a trial on the merits. Moreover, in my view it would not be in the best interest of criminal justice to extend the scope of the *Hitch* principle to encompass the issue of the credibility of a law enforcement witness during a hearing to suppress evidence pursuant to Penal Code section 1538.5.

THE CASE AT BENCH

In the instant case defendant Swearingen in a three-count information was charged with possession for purposes of sale of hashish (count I), cocaine (count II) and marijuana (count III), all in violation of Health and Safety Code section 11359, subdivision (a).[1]

---

[1]CONTRABAND SEIZED: Large amounts of marijuana were found in the van after defendant was placed under arrest. A large baggie of marijuana was found in a pocket of defendant's peacoat which was in the van along with $450 in cash. The Seagram's 7 Crown bag found under the driver's seat contained a baggie of marijuana. A storage

Defendant pleaded guilty to possession for purposes of sale of hashish (count I)[2] following the trial court's denial of his motion to suppress all evidence pursuant to Penal Code section 1538.5 and what defense counsel described as "something *analagous* to a Hitch motion." (Italics added.)

## THE MOTION TO SUPPRESS

"A proceeding under section 1538.5 to suppress evidence is a full hearing on the issues before the superior court sitting as finder of fact. [Citations.] The power to judge credibility of witnesses, resolve conflicts in testimony, weigh evidence and draw factual inferences, is vested in the trial court. On appeal all presumptions favor proper exercise of that power, and the trial court's findings—whether express or implied—must be upheld if supported by substantial evidence. [Citations.]" (*People* v. *Superior Court (Keithley)* (1975) 13 Cal.3d 406, 410 [118 Cal.Rptr. 617, 530 P.2d 585].)

Here at defendant's motion to suppress the evidence of the contraband, Officer Boissier testified that he looked in defendant's van window to check the ignition since the front license plate was missing indicating a possibility that the van may have been stolen. He observed a pill-type plastic vial "clear, light brown in color" approximately three to four inches tall and about an inch in diameter on the floorboard in front of the driver's seat. He also saw "a leafy substance" and "stems and seeds that resembled marijuana" inside the vial. Officer Richard Zalkowski testified that the missing vial, from which the marijuana had been removed, was an "off-white colored vial, a clear vial." Defendant Swearingen testified that the vial was "opaque in reference to translucent and transparent" and to see through the vial it would have to be held in the light.

---

compartment in the rear of the van contained a large baggie of marijuana and another baggie of marijuana-type substance known as Thai sticks.

Fifty-four grams of hashish were also found in defendant's apartment.

[2]DEFENDANT GUILTY: The guilty plea as to count I was pursuant to a plea bargain. At the time of his change of plea from not guilty to guilty he admitted in open court that he possessed the hashish for purposes of sale.

Here but for *People* v. *Hill* (1974) 12 Cal.3d 731 [117 Cal.Rptr. 393, 528 P.2d 1] (which holds that the harmless error doctrine is inapplicable on appeal from a guilty plea entered following erroneous denial of a motion to suppress evidence (Pen. Code, § 1538.5, subd. (m)), the judgment should clearly be affirmed under the harmless error doctrine.

At the time of sentencing, proceedings were suspended and defendant was placed on probation for 3 years, one condition being that he serve 180 days in local custody with credit for the 1 day he had already served. The local custody condition was stayed pending this appeal. The defendant is presently free on his own recognizance.

Other testimony disclosed that at time of the booking of the contraband at the police station the marijuana was removed from the vial and placed in a coin envelope for chemical analysis. The empty vial was placed in a box with other noncontraband items which included the empty Seagram's 7 Crown bag, mortar and pestle, strainer, a cocaine snorter, some paper work, and house keys. The box which contained the empty vial and the other noncontraband items was withdrawn from the booking room at the time of defendant's preliminary hearing and later the empty *vial,* Seagram's 7 Crown bag and a scale were missing.

The court below refused to apply the *Hitch* principle to the empty vial and resolved the conflict of testimony as to whether or not the marijuana could be seen inside the vial against defendant. The testimony of Officers Boissier and Zalkowski constitutes substantial evidence that the leafy substance, stems and seeds were visible through the sides of the vial under the conditions present at the time Officer Boissier first observed it.

HITCH DISTINGUISHED

The case of *People* v. *Hitch, supra,* 12 Cal.3d 641, is clearly distinguishable and simply does not apply.

In *Hitch* the defendant was charged with driving under the influence of alcohol. The extent of alcohol in the defendant's system had been tested by a breathalyzer, in which a sample of the person's breath passes through a glass test ampoule containing a reagent. The accuracy of the test depends upon the exact quantity of the reagent in the ampoule. The officer administering the test noted the result and then threw away the ampoule. The trial court made a finding that the preservation of the ampoule would have provided information of value to the defense to determine the accuracy of the test. The *Hitch* court, as noted in the majority opinion, said at pages 652-653 of 12 Cal.3d: "We think that the rule declared by the federal court in *Bryant* provides a solution for the problem now before us involving the chemical test of a driver's breath (Veh. Code, § 13353). As we have explained, the test ampoule, its contents and the reference ampoule customarily used in the test constitute material evidence on the issue of the driver's guilt or innocence of the charge of driving a vehicle under the influence of intoxicating liquor. We conclude that the investigative agency involved in the test has a duty to preserve and disclose such evidence. Accordingly we hold that, where, as here, such evidence cannot be disclosed because of its intentional but nonmalicious destruction by the investigative officials,

sanctions shall in the future be imposed for such nonpreservation and nondisclosure unless the prosecution can show that the governmental agencies involved have established, enforced and attempted in good faith to adhere to rigorous and systematic procedures designed to preserve the test ampoule and its contents and the reference ampoule used in such chemical test. The prosecution shall bear the burden of demonstrating that such duty to preserve the ampoules and their contents has been fulfilled. If the prosecution meets its burden and makes the required showing, then the *results* of the breathalyzer test shall be admissible in evidence, even though the ampoules and their contents have been lost. If the prosecution fails to meet its burden then the court shall apply sanctions for nondisclosure. Finally we hold that in such latter event due process shall not require a dismissal of the action but shall require merely that the *results* of the breathalyzer test be excluded from evidence." (Original italics, fns. omitted.)

The facts of the present case differ materially from *Hitch* in several major respects.

In *Hitch* the ampoule container and its contents are an inseparable unit by reason of the nature of the breathalyzer test. The ampoules and their contents (as a unit) were "material evidence on the issue of the driver's guilt or innocence of the charge of driving a vehicle under the influence of intoxicating liquor." (*Id.,* at p. 652.)

Here the plastic *vial* and *its* contents are separable. The marijuana found in the *vial,* which might be introduced at the expected trial on the issue of guilt or innocence, was preserved in a coin envelope and sent out for chemical analysis. The empty *vial* was placed in a box with other noncontraband items which did not have to be analyzed by a chemist. The vial *sans* the marijuana was of no value as to the guilt or innocence of the crimes with which defendant was charged at a trial on the merits.

### SCOPE OF THE EXCLUSIONARY RULE SHOULD NOT BE EXPANDED BY THE HITCH PRINCIPLE

In my opinion it was never the legislative intent by codifying the court-created exclusionary rule[3] into Penal Code section 1538.5 that its operation should embrace the application of the *Hitch* principle in

---

[3] THE EXCLUSIONARY RULE: The exclusionary rule can be defined as a rule which prohibits the admission into evidence at trial of that which was determined to have been

respect to the credibility of a police officer testifying at a hearing on a motion to suppress evidence brought under section 1538.5.

Moreover, in my view it is unwise to extend the scope of the *Hitch* principal by case law to encompass a credibility issue at a hearing on defendant's motion to suppress evidence as present here. The net effect of such a holding is to construct a steeple, or at least a cupola, onto the exclusionary rule cathedral thereby expanding the deleterious effects of that rule on the criminal justice system by further increasing delay and cost to the taxpayers in processing criminal cases and affording an even broader means for the guilty to escape responsibility for their criminal conduct resulting in a further loss of public confidence in the courts.

In my view we should be seeking creative alternatives to the exclusionary rule which experience has shown is "an unworkable and irrational concept of law"[4] in order to alleviate or erase the legendary problems inherent in its application rather than exacerbating those problems by grafting on the *Hitch* principle. Here again we march lock-step 180 degrees in the wrong direction.

Respondent's petition for a hearing by the Supreme Court was denied November 1, 1978.

obtained by a government agent as a result of "unreasonable search and seizure" in violation of the Fourth Amendment to the United States Constitution.

The exclusionary rule was not known to the common law. Its foundation as a rule of evidence was laid in 1886 in the case of *Boyd* v. *United States* (1886) 116 U.S. 616 [29 L.Ed. 746, 6 S.Ct. 524]. The rule was first applied in 1914 in federal courts (*Weeks* v. *United States* (1914) 232 U.S. 383 [58 L.Ed. 652, 34 S.Ct. 341]) and adopted by the California Supreme Court in 1955 (*People* v. *Cahan* (1955) 44 Cal.2d 434 [282 P.2d 905, 50 A.L.R.2d 513]). The United States Supreme Court extended the rule in 1961 to all state courts (*Mapp* v. *Ohio* (1961) 367 U.S. 643 [6 L.Ed.2d 1081, 81 S.Ct. 1684, 84 A.L.R.2d 933]). In 1967 the California Legislature embalmed the rule in Penal Code section 1538.5.

"The rule is calculated to prevent, not to repair. Its purpose is to deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it." (*Elkins* v. *United States* (1960) 364 U.S. 206, 217 [4 L.Ed.2d 1669, 1677, 80 S.Ct. 1437].)

[4]THE EXCLUSIONARY RULE UNWORKABLE AND IRRATIONAL: Increasing numbers of judges, lawyers, legal scholars and concerned citizens are questioning whether the exclusionary rule itself really accomplishes the purpose for which it was intended (see fn. 3, *ante*) and whether our slavish adherence to the rule is worth the exorbitant cost it imposes on the criminal justice system by way of delay, expenditure of tax dollars and loss of public confidence in our courts by creating an upside-down system which diverts the focus of the criminal prosecution from the guilt or innocence of the defendant to a trial of the police.

Chief Justice Warren Burger in his dissent in the case of *Coolidge* v. *New Hampshire* (1971) 403 U.S. 443 [29 L.Ed.2d 564, 91 S.Ct. 2022], in which the majority of the court

**580**

reversed the conviction of the defendant, found guilty by a jury, of the murder of a 14-year-old girl in 1964, on the grounds that evidence in the form of vacuum sweepings from the defendant's car was obtained in violation of the exclusionary rule, said: "This case illustrates graphically the monstrous price we pay for the exclusionary rule in which we seem to hâve imprisoned ourselves. . . ." (*Id.,* at p. 493 [29 L.Ed.2d at p. 598].)

In his dissent in *Bivens* v. *Six Unknown Fed. Narcotics Agents* (1971) 403 U.S. 388 [29 L.Ed.2d 619, 91 S.Ct. 1999], referring to the majority holding in the *Coolidge* case, Chief Justice Burger said: "[I]t is hardly surprising that such results are viewed with incomprehension by nonlawyers in this country and lawyers, judges and legal scholars the world over." (*Id.,* at p. 419 [29 L.Ed.2d at p. 640].)

In *Bivens* the Chief Justice lashes out at the exclusionary rule "as an anomalous and ineffective mechanism with which to regulate law enforcement." (*Id.,* at p. 420 [29 L.Ed.2d at p. 640].) He observes that "[i]n a country that prides itself on innovation, inventive genius, and willingness to experiment, it is a paradox that we should cling for more than a half century to a legal mechanism that was poorly designed and never really worked, . . ." (*id.,* at p. 424 [29 L.Ed.2d at p. 643]) and concludes that "[r]easonable and effective substitutes can be formulated . . . ." (*Id.,* at p. 421 [29 L.Ed.2d at p. 641].) He recommends that in lieu of the exclusionary rule "[C]ongress . . . develop an administrative or quasi-judicial remedy against the government itself to afford compensation and restitution for persons whose Fourth Amendment rights have been violated. . . ." (*Id.,* at p. 422 [29 L.Ed.2d at p. 641].) "[I]ndeed there is nothing to prevent a State from enacting a comparable statutory scheme without waiting for the Congress. Steps along these lines would move our system toward more responsible law enforcement on the one hand and away · from the irrational and drastic results of the suppression doctrine on the other. . . ." (*Id.,* at p. 424 [29 L.Ed.2d at pp. 642-643].)

I quote at length from the opinion by Chief Justice Weintraub of the State of New Jersey in *State* v. *Bisaccia* (1971) 58 N.J. 586 [279 A.2d 675].

"Truth and justice are inseparable. A deliberately false judgment debases the judicial process, and no less so because the false judgment is an acquittal. On a motion to suppress we deal with evidence of guilt, and the purpose of the litigant is to conceal that evidence to the end that he will escape conviction notwithstanding his guilt. Hypothetically there could be some case in which the evidence sought to be suppressed would falsely suggest guilt, but a judge would be short in realism if he did not understand that the evidence he is asked to suppress is evidence of guilt and that the judgment of not guilty which will ensue will likely be false. To justify so serious an insult to the judicial process, some compensating gain should be incontestable.

"One cannot reasonably deny the need for some remedy for a breach of the Fourth Amendment guaranty against an unreasonable search and seizure. The question is whether suppression of the truth with the consequent acquittal of the guilty is a fair and an effective measure to that end. The ostensible reason for the rule is to assure compliance with the Fourth Amendment by barring the use of the fruits of a violation. That suppression is effective in curtailing infractions of the Amendment is quite doubtful. See Oaks, 'Studying the Exclusionary Rule in Search and Seizure,' 37 U.Chi.L.Rev. 665 (1970). But if it were, the justice of the suppression doctrine would remain questionable as it was when *Mapp* was handed down, and even more so because of a decade of experience under that decision. The reasons are evident.

"The first right of the individual is to be protected from attack. That is why we have government, as the preamble to the Federal Constitution plainly says. In the words of Chicago v. Sturges, 222 U.S. 313, 322, 32 S.Ct. 92, 93, 56 L.Ed. 215, 220 (1911): 'Primarily, governments exist for the maintenance of social order. Hence it is that the obligation of the government to protect life, liberty, and property against the conduct of the indifferent, the careless, and the evil-minded, may be regarded as lying at the very foundation of the social compact.'

"The Bill of Rights was not intended to deny that primary mission. This is not to ·

belittle the inestimable rights thus consecrated, but rather to say that those rights may not be read to defeat the very reason for government itself.

"We must be mindful that the contest is not between the State and the individual. The contest is wholly between competing rights of the individual—the right to be protected from criminal attack and the several rights in the Amendments. When the truth is suppressed and the criminal is set free, the pain of suppression is felt, not by the inanimate State or by some penitent policeman, but by the offender's next victims for whose protection we hold office. In that direct way, *Mapp* denies the innocent the protection due them.

"But *Mapp* impairs the primary right of the individual to protection from crime in still other ways. The release of the guilty must blunt and breed contempt for the deterrent thrust of the criminal law. Moreover the case-by-case process of law-making in the application of *Mapp* has left State officers quite at sea as to what is expected of them. The time-distance between the Supreme Court and the firing line is just too great and the case-by-case process too lumbering and too cumbersome, to permit that Court to exercise effective and responsible management of the criminal business of the States. As a result, the State courts (and the federal bench as well) are drained of energy sorely needed for the trial of criminal and civil cases, as motions to suppress are piled upon motions, appeals upon appeals, and post-conviction proceedings upon post-conviction proceedings." (279 A.2d at pp. 676-677.)

Justice Macklin Fleming of the California Court of Appeal in his book Of Crimes and Rights (1978) in discussing the susceptibility of our criminal law to fragmentation of legal theory cites as a prime illustration our two views toward "illegally" obtained evidence.

"[T]he older view, articulated by Jeremy Bentham and Professor John H. Wigmore, theorized that a violation of law should not go unpunished merely because a second violation of law had been committed in the course of investigating the first, or, as Justice Benjamin N. Cardozo put it, the murderer should not go free because the constable blundered. Under this view all illegally obtained evidence was admissible. The opposite view [the prevailing Exclusionary Rule] flatly prohibits any use of evidence obtained in violation of law, even when the violation is purely technical. The latter view theorizes, in effect, it is better for a murderer to go free than for the state to take advantage of any illegal conduct on the part of its officers. . . ." (P. 23.)

He observes that by our total adherence to the latter view "[o]ur preoccupation with restrictions on police activity has become so great that an impression circulates that the chief end of criminal law is to prevent invasions by police rather than invasions by criminals. Unquestionably, this preoccupation has led to the release of patently guilty criminals and thereby weakened the deterrent effect of criminal law. . . ." (P. 23.) "[W]e have set fire to the house of criminal law in our attempt to roast the police pig. . . ." (P. 156.)

In arguing for more effective factual inquiry, Justice Fleming points out that "[o]ur reaction to abuse of authority by criminal investigators and police has taken a curiously convoluted and byzantine turn. In suppressing evidence and undertaking to immunize judicial process against abuse, we have sought to turn back the clock and reconstruct events as though the evidence never existed. Thus, we suppress the incriminating letter, eyewitness identification, discovery of the murder weapon, even discovery of the corpse, if those items of evidence are found to have been illegally obtained, and we solemnly conduct our factual hearing under the legal fiction that those events never happened. As so-called fruit of the poisonous tree, we erase entire chains of events by pretending they never took place." (Pp. 155-156.)

He suggests that the exclusionary rule(s) shuffle(s) "wild cards" into the deck which destroys effectiveness of factual inquiry and credibility by excluding facts that are demonstrably true and that such "[a]rtificial restrictions on factual hearing[s] may bring about the following consequences: the criminal escapes public examination and self-scrutiny of his conduct; the victim and potential victim see criminal law as helpless to

protect them; the potential criminal comes to look on the restraint of criminal law as ineffectual. The wrong lesson is taught, and the inevitable sequel is encouragement of rational criminal intent, emotional criminal intent, and apparent profitability of crime. By reducing *reliability* of factual hearing, we erode criminal law's ability to protect through deterrence, and we foster the impression that criminal law is aimed more at the process of criminal prosecution than at crime itself." (P. 157, original italics, fn. omitted.)

Justice Fleming suggests "[t]he primary remedy for abusive official conduct is not suppression of evidence but discipline of the abusive officer, and that illegally obtained evidence may be used in criminal prosecutions except when its illegality is so flagrant that its use would condone a greater crime than the one under prosecution. . . ." (P. 23.) He proposes "[t]hat in the interest of sound judicial administration we should change our rules for suppression of illegally obtained evidence from compulsory suppression to the carefully limited discretionary suppression that prevails in England." (P. 156.)

The English, based on centuries of experience, have coined a saying that "Not only must justice be done, but it must appear to have been done," which pays close attention to the public's concerns and attitudes. The exclusionary rule violates both requirements of the English saying. The proposals of Chief Justice Burger and Justice Fleming described above honor the validity of the English saying. Their proposals are reasonable alternatives to the exclusionary rule and warrant serious consideration by the legal community and the California Legislature. Logic and common sense dictate that such constructive alternatives will go a long way to reduce court congestion, restore public confidence in our criminal justice system and save California taxpayers millions of dollars annually which are presently being wasted on motions to suppress evidence.