[Crim. No. 31063. Second Dist., Div. One. July 30, 1979.]

THE PEOPLE, Plaintiff and Respondent, v.
VICTOR ARTHUR ALFIERI, JR., Defendant and Appellant.

## COUNSEL

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, Charles M. Sevilla, Chief Assistant State Public Defender, and Martin Stein, Deputy State Public Defender, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Norman H. Sokolow and Howard J. Schwab, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**THOMPSON, J.**—After a jury trial, 17-year-old Victor Arthur Alfieri, Jr., was convicted in the adult court of second degree murder and placed in the custody of the Youth Authority. In this appeal, he contends: (1) trial court action receiving in evidence his admissions and confession impels reversal because of application of an improper standard by the court in determining the facts preliminary to admissibility and because the record compels the conclusion they were unlawfully obtained; (2) the trial court erred in failing to impose an appropriate sanction for the prosecution's destruction of tape recordings of telephone conversations; (3) the jury was erroneously instructed with respect to the manner of its consideration of the credibility of Alfieri's testimony; and (4) the judgment fails to credit Alfieri with time served in custody in the period before judgment.

We conclude: (1) the trial court having determined the facts preliminary to the admissibility of Alfieri's statements by application of the preponderance of the evidence standard, *People* v. *Jimenez* (1978) 21 Cal.3d 595 [147 Cal.Rptr. 172, 580 P.2d 672], decided by our Supreme Court after the trial at bar but expressly made applicable to cases pending on appeal, mandates reversal for failure of the trial court to apply the

reasonable doubt standard to its determination; (2) because the reversal of the judgment remands the matter to the trial court for a new trial, we need not decide whether on the record the statements must be held to be inadmissible as a matter of law; (3) the trial court also applied an improper standard in ruling upon the consequences of the prosecution's destruction of the tape recordings but the error was harmless; (4) the propriety of the questioned jury instruction need not now be determined because the issue of its validity is presently before the Supreme Court; and (5) in the event Alfieri is convicted after retrial, he is entitled to credit against his sentence for prejudgment time in custody.

### Facts of Murder

Alfieri's sister was brutally murdered. Evidence, the most damning of which consists of Alfieri's admissions and his confession while in police custody, establishes his guilt of the crime. The detail of the admissions and confession meshes closely with the facts established by physical evidence and other testimony.

### Facts With Respect to Interrogation and Destruction of Tape Recordings

The testimony regarding the interrogation of Alfieri was first developed in two separate pretrial hearings, one on a motion to suppress his admissions and a confession made in the course of police questioning and then in a subsequent hearing on a motion to dismiss for the police destruction of tape recordings of conversations of deputy sheriffs with Alfieri's family. Both motions were renewed at the commencement at trial and were there denied. Because the ruling of the trial judge on the motion to suppress is based upon the entire record of both pretrial hearings, we recite the evidence without segregating its manner of pretrial presentation.

The body of Laura Alfieri, defendant's sister, was discovered on August 7, 1976. At 8:20 p.m. on August 22, San Luis Obispo deputy sheriffs met with Alfieri in his home where he lived with his parents. Based upon apparent discrepancies in information given by Alfieri to them concerning his whereabouts at the time Laura was murdered and statements of Alfieri's father, the deputies determined to question Alfieri further. Alfieri was 17 years old when questioned. He was of borderline low intelligence and subsequently psychiatrically diagnosed as highly suggestible. Alfieri had only one prior contact with the police.

At 9:30 p.m. on August 22, Alfieri voluntarily accompanied the deputy sheriffs to the San Luis Obispo station. Arriving at the station at 9:50, Alfieri was given a *Miranda* warning amplified by the statement that he had a right to the presence of his parents. He was interrogated until 4:30 a.m. on August 23. There were several short breaks in the course of the questioning. Alfieri denied connection with the murder. The deputies determined that he should be transported to his home with the thought that Alfieri would return the afternoon of the 23d for a polygraph examination.

Early on the morning of August 23 before Alfieri was returned home, his father telephoned the sheriff's station in San Luis Obispo. Pursuant to the regular practice of the sheriff's department, a tape recording was made of the call. In the course of a telephone conversation with Deputy Sheriff Hastie, the senior Alfieri inquired concerning his son and was told his son was all right. According to the father's unrebutted testimony, he also informed Hastie that Alfieri senior would arrange for an attorney for his son. Also according to the father's unrebutted testimony, Hastie replied that an attorney should not be secured; that if Alfieri, Jr., were represented by counsel, the sheriff's office would drop the investigation and Alfieri, senior, would never know what happened to his daughter. Hastie told the senior Alfieri that his son was being sent home and advised him that chances were his son might try to kill him and his wife so that the senior Alfieri should hide all weapons and knives as well as keys to his trucks.

Alfieri was transported to his home on the morning of August 23. He voluntarily returned to the sheriff's station at 3 p.m. on that day to undergo the polygraph examination. A *Miranda* warning was repeated, and the examination commenced at 3:15 p.m. continuing until 6:20 p.m. Alfieri failed the polygraph test and was so advised. He responded that "the machine was wrong."

Sheriff's deputies resumed the questioning of Alfieri at 6:45 p.m., and continued until 8:30 when it was interrupted so that Alfieri might eat dinner. Alfieri continued to deny his guilt. Questioning resumed at 9:10 p.m. After a 20-minute break at 9:40, the questioning was again pursued in a new format. A deputy asked that Alfieri assume that he was two people, one who could not remember what had occurred and the other who had killed his sister. Alfieri was then instructed to relate what could have occurred if in fact he were the killer. Through that process over a period of one and one-half hours, Alfieri reconstructed the detail of how

the crime could have occurred. Near the end of the interview he said, "I probably did it," and added that he had no memory of "it at certain points." After that statement, Alfieri said he would like to go home. The questioning deputy responded: "You can't. Can you ever go home and really feel everything is controllable, everything is?" Alfieri said, "I'd like to be with my parents though." The interrogator continued the questioning in the hypothetical situation format. In the course of his interrogation, the deputy said to Alfieri: "It takes a bigger man than you believe to admit that something happened and to admit that help is needed and I respect you as a man for that. The hardest thing in the world is admitting that a mistake was made." Alfieri responded, "I guess I did do it, you know, but I still don't think I did. . . ." The deputy told Alfieri that Alfieri's parents would stand behind him regardless of the outcome of the interrogation and would continue to do so "once the answer is found." The sheriff told Alfieri, "You have lived with it for three weeks." He volunteered to help Alfieri in his relationship with his parents and intervene with the "media" in the press coverage of the murder.

At sometime between 10 and 11:30 p.m., further questioning of Alfieri was conducted by Dr. Mosman, a psychologist retained by the San Luis Obispo sheriff's office. Mosman identified himself and stated that he was working for the sheriff so there would be no psychotherapist privilege. He said he wanted to "help" Alfieri and that he would see that psychiatric treatment was secured whether Alfieri confessed or not. Mosman continued the interrogation using the hypothetical technique with Mosman assuming the role of the victim.

At about midnight of August 23d or the early hours of the 24th, Alfieri's father telephoned the sheriff's office. The call was made through a telephone on which calls were routinely tape recorded. The senior Alfieri again mentioned to a deputy that he intended to secure a lawyer for his son. The deputy answered that all would be cleared up in about half an hour. The deputy called back to inform Alfieri, senior, that his son had confessed. The same information was conveyed by the deputy to Alfieri, junior's, grandmother and to Bob Baldwin, a trusted friend and confidant of Alfieri, junior.

Shortly after midnight, Alfieri was formally arrested and booked for murder. Because he was a juvenile, he was placed in an "isolation cell," a six- by eight-foot room with only an observation window. At 8 a.m., a deputy sheriff and Dr. Mosman reinstituted the hypothetical assumption technique of questioning Alfieri, continuing the process for about an

hour. Alfieri was returned to his cell where he remained until about 1:30 p.m. when he was interviewed for two hours by a psychiatrist retained by the district attorney.

At about 5 p.m., Alfieri's father and grandmother, as well as Bob Baldwin, were permitted to visit Alfieri separately and for periods of about 10 minutes apiece. Each had been informed by sheriff's deputies that Alfieri had confessed although in truth Alfieri had only admitted the possibility that he had committed the murder while professing to have no memory of what had occurred. When visited by his father and by Baldwin, Alfieri was crying. He said, "Dad, I want to come home." Alfieri, senior, having been told that his son had confessed, replied, "Son, this is the first time in my life that I just can't help you." Alfieri queried, "Well, do you think I'm guilty, dad?" The father responded, "It looks that way." Alfieri said, "If I'm guilty, how come I can't remember?" Alfieri, senior, answered: "Well, son, if you can't remember and you done it, you're awful, awful sick and you are going to need some help and no matter what, I love you and I stand behind you." Alfieri then asked to see Baldwin. Following his conversation with Baldwin, Alfieri met with his grandmother.

Having been told by a deputy sheriff that Alfieri had already confessed, the grandmother came into the room and said: "They have all the proof of it, Skipper [Alfieri's nickname], and you must have done it. So tell them and they'll get you help." Alfieri responded by asking for one of the interrogating deputies by name. When that officer came to the interrogation room, Alfieri confessed. An interrogating deputy subsequently informed Alfieri's father and grandmother that he had told Alfieri that he would "blister his ass" if he did not tell the truth.

On September 21, 1976, Alfieri's counsel, in connection with Alfieri's preliminary hearing, filed and served on the prosecution a notice of motion to compel discovery. Among other items, the motion sought: "Tape recordings of all telephone calls between the San Luis Obispo County Sheriff's Department and defendant Victor Alfieri, Jr.'s residence, 238-2439, either incoming or outgoing, made between August 21st, 1976, and August 26, 1976." The motion was heard by the magistrate on September 23. Two members of the team of investigating deputy sheriffs were in the magistrate's courtroom at the time the motion was heard and ruled upon as part of a large calendar of matters. The district attorney acquiesced that the discovery sought was proper. In connection with the hearing on the motion, Alfieri's counsel said: "I'm also concerned, Your

Honor, with the tape recordings that I believe were made of incoming telephone calls as I have requested in the Notice of Motion which the D.A. has agreed to, but the problem is I don't know whether the Sheriff's Department keeps their tape recordings and, if so, for how long. [¶] I'd ask that no tapes be destroyed which pertain to this in any way." The prosecutor responded: "Well, my only comment in response to that is that obviously we can't provide anything that's not in existence as of the date of the order, and when the order is served, certainly it's our intention to comply with the order once it's served as to the existing items."

The magistrate ruled: "I think it would be appropriate at this time for the Court to order the People to put the Sheriff on notice this date that he is not to destroy any items of physical property pertaining to this case without further order of the Court." Defense counsel asked, and was granted permission, to reduce the magistrate's ruling to a written order.

A formal written order memorializing the magistrate's ruling of September 23 was prepared by Alfieri's counsel and signed by the magistrate on September 28. The order was served on the district attorney on September 30.

It was the practice of the San Luis Obispo sheriff's office to preserve all tape recordings of incoming and outgoing telephone calls for 30 to 31 days computed on a 24-hour basis beginning at midnight and to routinely erase the tapes at the end of the period. Thus the tape of Alfieri, senior's, telephone conversation of August 23 was in existence at the time that the notice of the discovery motion was served. The tape may or may not have been erased at the time of the magistrate's oral order on September 23, depending upon whether the tape was one of those retained for 30 days or one of those retained for 31 days. The time for routine preservation of the tape had expired by the time the written order was signed and served. The tape of the telephone conversation of August 24 was in existence at the time of the magistrate's oral order but not at the time the written order was entered. The record does not disclose any procedure employed by the district attorney or sheriff with respect to preservation of physical evidence described in a notice of discovery motion or in an oral or written order issued in response to such a motion.

Alfieri filed pretrial motions to bar evidence of the confession on the theory that it was involuntary and obtained in violation of his *Miranda* rights and to dismiss the information for destruction of the tape recordings. The motions were denied. When renewed at trial, they were

again denied. Both at the pretrial motion to suppress the confession and again at its renewal at trial, the court determined the contested preliminary facts by applying the preponderance of evidence test.

## Admissibility of Confession

In this appeal, Alfieri contends that the trial court erred in not applying the reasonable doubt rather than preponderance of the evidence test in determining whether the prosecution had carried its burden of proof of establishing the necessary facts preliminary to the admissibility of Alfieri's admissions and confession. He contends, also, that irrespective of the test of burden of persuasion, the admissions and confession must on the record be deemed to be involuntary as a matter of law. The prosecution concedes that *People* v. *Jimenez, supra,* 21 Cal.3d 595, 606-607, compels the conclusion that the trial court erred in not holding the prosecution to the burden of establishing beyond a reasonable doubt the preliminary facts necessary to admissibility of the statements. The prosecution also concedes that while *Jimenez* was decided after the trial at bar it applies retroactively on this appeal. (21 Cal.3d at pp. 608-609.) Noting that the *Jimenez* principle is subject to the *Watson* test of harmless error (21 Cal.3d at p. 609), the prosecution rests its argument for affirmance upon the proposition that from a reading of the entire record of the hearings on admissibility of Alfieri's statements there is no reasonable probability that a result more favorable to Alfieri would have been reached had the correct standard of burden of persuasion been applied.

In light of the prosecution's concession and its support in *Jimenez,* we limit our discussion with respect to the trial court action receiving Alfieri's statements to the prejudicial or harmless character of the trial court's failure to apply the retroactively enforced reasonable doubt standard for determining the preliminary facts to admissibility. A new trial will be required if either the trial court is found to have prejudicially erred by application of an improper standard of proof or by receiving in evidence a confession which the record discloses to be involuntary as a matter of law. (See *People* v. *Murphy* (1963) 59 Cal.2d 818, 833 [31 Cal.Rptr. 306, 382 P.2d 346]; *People* v. *Green* (1968) 264 Cal.App.2d 614, 624 [70 Cal.Rptr. 647]; *People* v. *Phillips* (1969) 270 Cal.App.2d 381, 385 [75 Cal.Rptr. 720, 45 A.L.R.3d 105], cert. den., 396 U.S. 1021 [24 L.Ed.2d 514, 90 S.Ct. 593].)

We conclude that the error is prejudicial. Because except in the situation where it is cumulative of another confession properly received in evidence an erroneously admitted confession is treated as necessarily prejudicial (*People* v. *Randall* (1970) 1 Cal.3d 948, 958 [83 Cal.Rptr. 658, 464 P.2d 114]), we focus our analysis upon the potential of a different result on the issue of the admissibility of Alfieri's statements if the trial court had applied the proper standard of proof. Viewing the record as a whole, we believe that there is a reasonable probability that had the correct standard been applied the trial court might have determined that the prosecution had not established the voluntary nature of Alfieri's statements beyond a reasonable doubt.

Several factors disclose the issue to be finely balanced in two respects: There is a close question concerning the extent to which the statements were obtained in violation of an accused's right to counsel and assertion of the right to silence; and an equally close question of the extent to which the statements were the product of psychological coercion.

*Interference with right to counsel and to terminate questioning.* There is unrebutted evidence in the record that at the termination of the time of the first all-night questioning session of Alfieri, and before Alfieri was to be returned to his home, the sheriff's department dissuaded Alfieri's father from an intention to secure counsel for his son by telling the elder Alfieri that if he obtained counsel the sheriff's department would close its investigation so that Alfieri, senior, would never know who murdered his daughter. We cannot say that had the trial court applied a proper standard of decision there is no reasonable probability that it would not have concluded that the testimony was credible and raised a reasonable doubt of interference by the sheriff's department with Alfieri's representation by counsel to be retained by his father at a time before questioning resumed and inculpating statements were obtained.

Alfieri's request to see his parents in the course of the questioning of the night of August 23 presents still another problem. In *People* v. *Burton* (1971) 6 Cal.3d 375, 383-384 [99 Cal.Rptr. 1, 491 P.2d 793], our Supreme Court said: "[w]e hold that when . . . a minor is taken into custody and is subjected to interrogation, without the presence of an attorney, his request to see one of his parents, made at any time prior to or during questioning, must, in the absence of evidence demanding a contrary conclusion, be construed to indicate that the minor suspect desires to invoke his Fifth Amendment privilege. The police must cease custodial interrogation immediately upon exercise of the privilege." Here Alfieri, in

the course of the questioning, said that he would like to be with his parents. While in context the statement is subject to conflicting inferences, one, that Alfieri would like to go home to be with his parents, and the other that he desired their counsel, we cannot conclude that there is no reasonable probability that the latter inference might not have been drawn by the trial court had it applied the reasonable doubt standard.

We recognize that a recent decision of the United States Supreme Court in *Fare* v. *Michael C.* (1979) 442 U.S. 707, [61 L.Ed.2d 197, 99 S.Ct. 2560], casts doubt upon the validity of *Burton* to the extent the California decision may be said to rest upon rights guaranteed by the United States Constitution. All indications, however, are that *Burton* will be construed as founded upon the independent state ground of the California Constitution. While declining to express a standard of decision for determining when the independent state ground concept is applicable (*People* v. *Norman* (1975) 14 Cal.3d 929 [123 Cal.Rptr. 109, 538 P.2d 237]), the California high court has consistently applied the principle when its effect is to expand the rights of a criminal defendant over those enunciated by the high court of the United States. In a closely analogous area, the California Supreme Court has continued the rule of *People* v. *Fioritto* (1968) 68 Cal.2d 714 [68 Cal.Rptr. 817, 441 P.2d 625] on independent state grounds despite action of the United States Supreme Court to the contrary in *Michigan* v. *Mosley* (1975) 423 U.S. 96 [46 L.Ed.2d 313, 96 S.Ct. 321]. (*People* v. *Pettingill* (1978) 21 Cal.3d 231, 246-252 [145 Cal.Rptr. 861, 578 P.2d 108].)

*Coercion.* There is also a great deal of evidence in the record supportive of a conclusion that Alfieri's statements are the product of a psychologically coercive course of questioning.

■ Coercion which renders a confession inadmissible may be psychological as well as physical. (*People* v. *Wright* (1976) 60 Cal.App.3d 6, 14 [131 Cal.Rptr. 311].) The presence or absence of coercion and hence the involuntary or voluntary nature of a confession must be tested by "the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." (*Schneckloth* v. *Bustamonte* (1973) 412 U.S. 218, 226 [36 L.Ed.2d 854, 862, 93 S.Ct. 2041]; see also *Fare* v. *Michael C., supra,* 442 U.S. 707, 725, [61 L.Ed.2d 197, 212].) ■ The burden is upon the prosecution to establish that an accused's statements are voluntary; the burden is greater in the case of a juvenile than the case of an adult. (*In re Gault* (1967) 387 U.S. 1, 55 [18

L.Ed.2d 527, 561, 87 S.Ct. 1428]; *Gallegos* v. *Colorado* (1962) 370 U.S. 49, 54 [8 L.Ed.2d 325, 328, 82 S.Ct. 1209, 87 A.L.R.2d 614].)

■ Minority itself does not invalidate a minor's confession obtained after a recitation of *Miranda* rights and waiver by the minor of his privilege against self-incrimination and the right to consult with counsel. (*People* v. *Lara* (1967) 67 Cal.2d 365, 383 [62 Cal.Rptr. 586, 432 P.2d 202].) The age of a minor and his subnormal intelligence are, however, factors to be weighed in determining the voluntariness of his confession. (*Schneckloth* v. *Bustamonte, supra,* 412 U.S. 218, 226 [36 L.Ed.2d 854, 862]; *Gallegos* v. *Colorado, supra,* 370 U.S. 49, 54 [8 L.Ed.2d 325, 328]; *People* v. *Lara, supra,* 67 Cal.2d 365, 385.) So is the psychological impact of the questioning. (*Schneckloth, supra,* 412 U.S. at p. 226 [36 L.Ed.2d at p. 862]; *Gallegos, supra,* 370 U.S. at p. 54 [8 L.Ed.2d at p. 328]; *Lara, supra,* 67 Cal.2d at pp. 385-386.)

■ Prolonged interrogation in the absence of counsel is inherently coercive. (*Blackburn* v. *Alabama* (1960) 361 U.S. 199, 206 [4 L.Ed.2d 242, 247, 80 S.Ct. 274]; *Reck* v. *Pate* (1961) 367 U.S. 433, 440-441 [6 L.Ed.2d 948, 953-954, 81 S.Ct. 1541]; *Spano* v. *New York* (1959) 360 U.S. 315, 321-322 [3 L.Ed.2d 1265, 1270-1271, 79 S.Ct. 1202]; *Watts* v. *Indiana* (1949) 338 U.S. 49, 54-55 [93 L.Ed. 1801, 1806-1807, 69 S.Ct. 1347, 1357]; *People* v. *Pettingill, supra,* 21 Cal.3d 231, 242.)

■ Here the record reveals an accused 17 years of age, of borderline low intelligence and psychiatrically diagnosed as highly suggestible. Here the record discloses an interrogation consuming approximately 20 hours out of a total time in police custody of about 36 with much of the interrogation conducted at night and in the small hours of the morning over periods in excess of 8 hours each. Here the record discloses that Alfieri did not give his unqualified confession until after the sheriff's office had in effect induced it by falsely informing Alfieri's father, grandmother, and a trusted friend that Alfieri had confessed, and then permitted the father, grandmother, and friend to visit with Alfieri. Here the record discloses a technique of questioning by deputy sheriffs and a police psychologist which required Alfieri to assume he was the murderer and to state how he would have acted if he were. Here the record establishes that the psychologist told Alfieri that the psychologist would help him, and that the interrogating deputy sheriff counseled that he would respect Alfieri as a man if he admitted that a mistake had been made and he needed help. Here there is evidence that Alfieri was in a highly emotional state when he decided to confess.

In this combination of circumstances, we must conclude that had the trial court imposed upon the prosecution the burden of proof mandated by *Jimenez* there is a reasonable probability that the court might have concluded that some or all of Alfieri's statements were not voluntary but were coerced. Hence *Jimenez* compels reversal of the case at bar.

### Destruction of Tape Recordings

■ In ruling upon defendant's motion for sanctions for the destruction of the tape recordings of telephone conversations to and from the sheriff's office, the trial court said: "The Motion to Dismiss is denied. The Court finds no bad faith or intentional disregard of the Court order. The Court finds no evidence which supports any showing of materiality, substantial or modest. Whatever evidence might have been preserved by the protection of the tapes, the Court finds to have been erased and therefore eliminated from the jury's hearing and that of the Court on the question of voluntariness, but that this was harmless beyond a reasonable doubt."

The trial court did not apply the correct standard of decision in ruling upon the motion. Good faith unintentional destruction by the prosecution or police of evidence favorable to a defendant on a crucial issue requires the trial court to impose a sanction appropriate to preserving the defendant's right to a fair trial absent proof that the governmental agencies involved have established, enforced, and attempted in good faith to adhere to rigorous and systematic procedures to preserve the missing evidence. (*People* v. *Hitch* (1974) 12 Cal.3d 641, 652-653 [117 Cal.Rptr. 9, 527 P.2d 361].) The burden of preservation applies to physical evidence relevant to the determination of preliminary facts requisite to the admissibility of critically incriminating evidence. (*People* v. *Swearingen* (1978) 84 Cal.App.3d 570, 574 [148 Cal.Rptr. 755].)

Here the tape recordings were relevant to Alfieri's claim that the sheriff's department acted to deprive him of counsel to be obtained by his father. The recordings were relevant also as supporting the inference of coercive conduct by the interrogating officers. Alfieri's statements were, of course, crucial evidence. Thus, contrary to the trial court's standard of decision on Alfieri's motion, the fact that the tapes were erased from the court's hearing was a reason to grant rather than to deny the motion.

Any error in the trial court's ruling is, however, harmless. Violation of the prosecution's obligation to preserve evidence does not justify the

sanction of dismissal of the information; rather, the appropriate sanction is exclusion of evidence. (*People* v. *Hitch, supra,* 12 Cal.3d 641, 652-653.) Here the evidence that would have been excludable had the trial court applied the proper standard and found in favor of the defendant would have been the sheriff officers' version of the recorded telephone conversation. No such evidence was introduced.

We thus conclude that, while the trial court erred in its basis of decision on the motion, the error is harmless.

### CALJIC No. 2.62

Alfieri testified at his trial. In terms of CALJIC No. 2.62, the trial court instructed that it was a defendant's right not to testify but that if he did and failed to explain or deny facts against him which he could reasonably be expected to deny or explain because of facts within his knowledge the jury might draw inferences adverse to the defendant because of his failure to deny or explain. The trial court also gave four instructions relating to the credibility of witnesses in general.

Claiming that there is nothing in the record to indicate that Alfieri failed to explain or deny evidence which he might reasonably be expected to deny or explain, and that in any event CALJIC No. 2.62 improperly singles out a defendant's credibility from that of other witnesses, Alfieri asserts error in the instruction in terms of CALJIC No. 2.62.

We do not reach that contention. The propriety of CALJIC No. 2.62 is now pending before our Supreme Court in *People* v. *Saddler* (Crim. 20657, hg. granted Aug. 28, 1978) and *People* v. *Ellers* (Crim. 20666, hg. granted Sept. 7, 1978). Hearing in *Saddler* and *Ellers* was granted almost a year ago so that presumably a decision of the Supreme Court will be available to guide the court on retrial.

### Back Time

The judgment of conviction fails to credit Alfieri with prejudgment time of incarceration pursuant to Penal Code section 2900.5. *People* v. *Sandoval* (1977) 70 Cal.App.3d 73, 88-91 [138 Cal.Rptr. 609], requires that

the credit be allowed. We assume that the trial court will apply *Sandoval* in the event that Alfieri should again be convicted on retrial.

*Disposition*

The judgment is reversed.

Lillie, Acting P. J., concurred.

**HANSON, J.,** Concurring.—Sometime after dark on August 6, 1976, Laura Alfieri, age 15, was murdered. She was stabbed 5 times in front and 25 times in the back. Her body, completely clothed and partially covered by some old tires and brush, was discovered by deer hunters in the early hours of the following morning. There was no evidence of a struggle nor of sexual molestation.

On August 24, 1976, Victor Arthur Alfieri, Jr., the 17-year-old brother of Laura, was arrested for the murder of his sister. On Feburary 7, 1977, following a 32-day trial a jury found defendant guilty of murder in the second degree giving rise to this appeal.

As correctly noted in the majority opinion, "Evidence, the most damning of which consists of Alfieri's admissions and his confession while in police custody, establishes his guilt of the crime. The detail of the admissions and confession meshes closely with the facts established by physical evidence and other testimony."

In determining the voluntariness of defendant's admission(s) and confession(s) the court below applied the preponderance of evidence test.

While the instant case was on appeal, the state Supreme Court in *People* v. *Jimenez* (1978) 21 Cal.3d 595 [147 Cal.Rptr. 172, 580 P.2d 672], held that the preponderance of evidence test for determining the admissibility of a defendant's confession is no longer applicable in California. The court held that the standard of proof to be applied in determining the voluntariness of a defendant's confession is beyond a reasonable doubt and that this new rule was to be applied to cases pending on appeal.

Accordingly, under the compulsion of *Jimenez,* I reluctantly[1] concur with the majority opinion that the judgment of conviction must be reversed and the matter remanded for retrial. I would, however, add the caveat for guidance of the trial court that since the state Supreme Court, as it were, changed "the rules of the game" midstream that the issue as to the voluntariness of defendant's admission(s) and confession is thrown at large and on a rehearing on that issue both sides should have the opportunity to introduce additional evidence and reargue the matter.

A petition for a rehearing was denied August 22, 1979, and respondent's petition for a hearing by the Supreme Court was denied September 26, 1979. Manuel, J., was of the opinion that the petition should be granted.

---

[1]My reluctance stems from the fact that *but for Jimenez* I would affirm the judgment of conviction and that I approve of the analysis leading the United States Supreme Court in *Lego* v. *Twomey* (1972) 404 U.S. 477 [30 L.Ed.2d 618, 92 S.Ct. 619], to conclude that the preponderating evidence should be retained (as noted by Justices Clark and Richardson in *Jimenez*).

In *Lego,* the court said at pages 488-489 [30 L.Ed.2d at p. 627]: "[W]e are unconvinced that merely emphasizing the importance of the values served by exclusionary rules is itself sufficient demonstration that the Constitution . . . requires admissibility to be proven beyond reasonable doubt. Evidence obtained in violation of the Fourth Amendment has been excluded from federal criminal trials for many years. [Citation.] The same is true of coerced confessions offered in either federal or state trials. [Citations.] But, from our experience over this period of time no substantial evidence has accumulated that federal rights have suffered from determining admissibility by a preponderance of the evidence. Petitioner offers nothing to suggest that admissibility rulings have been unreliable or otherwise wanting in quality because not based on some higher standard. Without good cause, we are unwilling to expand currently applicable exclusionary rules by erecting additional barriers to placing truthful and probative evidence before state juries and by revising the standards applicable in collateral proceedings. Sound reason for moving further in this direction has not been offered here nor do we discern any at the present time. This is particularly true since the exclusionary rules are very much aimed at deterring lawless conduct by police and prosecution and it is very doubtful that escalating the prosecution's burden of proof in Fourth and Fifth Amendment suppression hearings would be sufficiently productive in this respect to outweigh the public interest in placing probative evidence before juries for the purpose of arriving at truthful decisions about guilt or innocence." In a footnote the high court added: "It is no more persuasive to impose the stricter standard of proof as an exercise of supervisory power than as a constitutional rule." (*Id.,* at p. 488, fn. 16 [30 L.Ed.2d at p. 627].)